**CCC INFORMATION SERVICES, INC., Plaintiff–Appellee,**

v.

**MACLEAN HUNTER MARKET REPORTS, INC., Defendant–Appellant,**

**Creative Automation Co., Defendant.**

**No. 1312, Docket 93–7687.**

United States Court of Appeals, Second Circuit.

Argued March 2, 1994.

Decided Dec. 5, 1994.

---

Stephen M. Feldman, Washington, DC (David Kolker, Spiegel & McDiarmid, Washington, DC), Thomas P. Sarro and Brewster Taylor, Larson and Taylor, Arlington, VA, for defendant-appellant.

Monica L. Thompson, Chicago, IL (James J. Casey, Keck, Mahin & Cate, Chicago, IL and Lawrence H. Lissitzyn, Reid & Riege, Hartford, CT), for appellee.

James F. Rittinger and Mark A. Fowler, New York City (Satterlee Stephens Burke & Burke), on the brief for amici curiae.

Before: KEARSE, PIERCE, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

The appellant, publisher of a compendium of its projections of used car valuations, seeks to establish copyright infringement on the part of a competitor, which copied substantial portions of appellant's compendium into the computer data base of used car valuations it offers to its customers. Arising in the wake of the Supreme Court's decision in *Feist Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), this appeal raises the question of the scope of protection afforded by the copyright law to such compilations of informational matter. Finding no infringement, the district court granted summary judgment to the appellee. In our view, the copyright law offers more substantial protection to such compilations than envisioned in the district court's ruling. We therefore reverse.

## Background

*The Red Book.* The appellant is Maclean Hunter Market Reports, Inc. ("Maclean"). Since 1911, Maclean, or its predecessors, have published the *Automobile Red Book— Official Used Car Valuations* (the "Red Book").[1] The Red Book, which is published eight times a year, in different versions for each of three regions of the United States (as well as a version for the State of Wisconsin), sets forth the editors' projections of the values for the next six weeks of "average" versions of most of the used cars (up to seven years old) sold in that region.[2] These predicted values are set forth separately for each automobile make, model number, body style, and engine type. Red Book also provides predicted value adjustments for various options and for mileage in 5,000 mile increments.

The valuation figures given in the Red Book are not historical market prices, quotations, or averages; nor are they derived by mathematical formulas from available statistics. They represent, rather, the Maclean editors' predictions, based on a wide variety of informational sources and their professional judgment, of expected values for "average" vehicles for the upcoming six weeks in a broad region. The introductory text asserts, "You, the subscriber, must be the final judge of the actual value of a particular vehicle. Any guide book is a supplement to and not a

---

1. For the entire period at issue in this case, each edition of the Red Book has included a copyright notice, and has been registered with the U.S. Copyright Office.

2. Maclean also publishes the Older Car/Truck Red Book, which offers similar projected valuations for vehicles eight to eighteen years old.

substitute for expertise in the complex field of used vehicle valuation."

*CCC's computer services.* Appellee CCC Information Services, Inc. ("CCC"), is also in the business of providing its customers with information as to the valuation of used vehicles. Rather than publishing a book, however, CCC provides information to its customers through a computer data base. Since at least 1988, CCC has itself been systematically loading major portions of the Red Book onto its computer network and republishing Red Book information in various forms to its customers.[3]

CCC utilizes and resells the Red Book valuations in several different forms. CCC's "VINguard Valuation Service" ("VVS") provides subscribers with the average of a vehicle's Red Book valuation and its valuation in the NADA Official Used Car Guide (the "Bluebook"), the other leading valuation book, published by the National Automobile Dealers Association ("NADA"). The offer of this average of Red Book and Bluebook satisfies a market because the laws of certain states use that average figure as a minimum for insurance payments upon the "total loss" of a vehicle. CCC's "Computerized Valuation Service" ("CVS"), while it primarily provides its subscribers with CCC's independent valuation of used cars, also provides customers with the Red Book/Bluebook average and the Red Book values standing alone.

It is uncontested that CCC earns significant revenues through the sale of its services, in which it both directly and indirectly resells the figures it copies every few weeks from the Red Book. As the court found below, since 1988 numerous Red Book customers have canceled their subscriptions, opting instead to purchase CCC's services. Op. at 25 (JA 665).

*Proceedings below.* CCC brought this action in 1991, seeking, inter alia, a declaratory judgment that it incurred no liability to Maclean under the copyright laws by taking and republishing material from the Red Book. Maclean counterclaimed alleging infringe-ment. CCC then pleaded various affirmative defenses, including that it used the Red Book for its intended purpose, fair use, and that the Red Book has come into the public domain as the result of its adoption in state statutes regulating the amount of insurance payments. CCC also made various contentions based on waiver, estoppel, consent, and untimeliness.

Both sides moved for summary judgment, and the motions were referred for report and recommendation to Magistrate Judge Arthur H. Latimer. Magistrate Judge Latimer recommended to the district court that CCC's motion for summary judgment be granted. Judge Latimer found (1) that the Red Book employed no originality or creativity in the selection, coordination or arrangement of data, and therefore did not constitute a protected "original work of authorship," 17 U.S.C.A. § 101 (West 1977); (2) that the Red Book valuations were facts, or interpretations of facts, and were, therefore, not protected by copyright; (3) that, even if the entries were not facts, copyright protection was nonetheless precluded by the doctrine of "merger of idea and expression," because each entry in the Red Book is an idea—the idea of the value of the particular vehicle—and that idea is necessarily communicated by a dollar figure; and (4) that the Red Book had been placed in the public domain by being "incorporated into governmental regulations." District Judge Nevas then "approved, adopted and ratified" the Magistrate Judge's recommended ruling, and judgment was entered in CCC's favor. Endorsement at JA 671.

### Discussion

■ 1. *Does the Red Book manifest originality so as to be protected by the copyright laws?* The first significant question raised by this appeal is whether Maclean holds a protected copyright interest in the Red Book. CCC contends, and the district court held, that the Red Book is nothing more than a compilation of unprotected facts, selected and

---

**3.** In 1981, CCC unsuccessfully attempted to secure a license from Maclean to use Red Book valuations on its on-line services. In 1984, CCC wrote to the publisher of the Red Book to inform it that it was being "ripped off" because another computer averaging service was using Red Book's figures.

organized without originality or creativity, and therefore unprotected under the Supreme Court's teachings in *Feist*. We disagree.

The Copyright Act of 1976 explicitly confers limited protection on compilations. Section 103(a) specifies that "[t]he subject matter of copyright ... includes compilations," which are defined by Section 101 as assemblies of data "selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"; Section 103(b) makes clear that the protection in a compilation "extends only to the material contributed by the author of such work ... and does not imply any exclusive right in the preexisting material." 17 U.S.C.A. §§ 101–103 (West 1977).

In *Feist*, the Supreme Court ruled that originality is an essential element of copyright protection, and that toil, or "sweat of the brow," expended in collecting information does not justify conferring copyright protection on a compilation of facts; rather, protection attaches only if the selection, coordination, or arrangement exhibit originality, so that "the resulting work as a whole constitutes an original work of authorship." 17 U.S.C.A. § 101 (West 1977). Concluding that a white pages telephone directory, consisting of an alphabetical listing of the names, towns of residence, and telephone numbers of all the subscribers in the area of the telephone company's franchise (as required by state law), "lack[ed] the requisite originality," 499 U.S. at 364, 111 S.Ct. at 1297, the Court held that the white pages were not within the protection of the copyright, and could therefore freely be copied by the publisher of another telephone directory without infringement.

Notwithstanding its conclusion with respect to such a telephone directory, the Court emphasized that

> [o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be.

*Id.* at 345, 111 S.Ct. at 1287 (citations omitted). The Court repeatedly stressed that the required level of originality is minimal, and that most compilations, merely by exercising some independent choice in the coordination, selection, or arrangement of data, will pass the test.[4] The telephone directory failed because it was found to be *completely* devoid of originality.

■ The protection of compilations is consistent with the objectives of the copyright law, which are, as dictated by the Constitution, to promote the advancement of knowledge and learning by giving authors economic incentives (in the form of exclusive rights to their creations) to labor on creative, knowledge-enriching works. U.S. Const. art. 1, § 8, cl. 8 ("Congress shall have the Power ... To promote the Progress of Science ... by securing for limited Times to Authors ... the exclusive Right to their ... Writings").

> [T]he originality requirement is not particularly stringent. A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (*i.e.*, without copying that selection or arrangement from another work), and that it display some minimal level of creativity. Presumably, the vast majority of compilations will pass this test, but not all will. There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent.
> 
> *Id.* at 358–59, 111 S.Ct. at 1294.

---

4. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.

*Feist*, 499 U.S. at 348, 111 S.Ct. at 1289 (citations omitted).

Compilations that devise new and useful selections and arrangements of information unquestionably contribute to public knowledge by providing cheaper, easier, and better organized access to information. Without financial incentives, creators· of such useful compilations might direct their energies elsewhere, depriving the public of their creations and impeding the advance of learning.

The grant of such monopoly protection to the original elements of a compilation, furthermore, imposes little cost or disadvantage to society. The facts set forth in the compilation are not protected and may be freely copied; the protection extends only to those aspects of the compilation that embody the original creation of the compiler. For these reasons, the copyright law undertakes to guarantee the exclusive rights of compilers, like other authors, to whatever is original and creative in their works, even where those original contributions are quite minimal.

The thrust of the Supreme Court's ruling in *Feist* was not to erect a high barrier of originality requirement. It was rather to specify, rejecting the strain of lower court rulings that sought to base protection on the "sweat of the brow," that *some* originality is essential to protection of authorship, and that the protection afforded extends only to those original elements. Because the protection is so limited, there is no reason under the policies of the copyright law to demand a high degree of originality. To the contrary, such a requirement would be counterproductive. The policy embodied into law is to encourage authors to publish innovations for the common good—not to threaten them with

loss of their livelihood if their works of authorship are found insufficiently imaginative.

In recognition of these considerations, we have several times since *Feist* upheld copyright claims for compilations and similar works where the originality component was extremely modest. In *Kregos v. Associated Press*, 937 F.2d 700, 706–07 (2d Cir.1991), for example, we reversed a ruling of the district court that the selection of nine statistical categories for use on a baseball pitching form failed to demonstrate the necessary originality. In *Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 514 (2d Cir.1991), we held, inter alia, that the selection, from a more general list, of businesses of special interest to Chinese-Americans also merited copyright protection. Several years before *Feist,* in *Eckes v. Card Prices Update,* 736 F.2d 859, 863 (2d Cir. 1984), we held that an author's subjective decision as to which baseball cards are "premium" is entitled to protection.[5]

In our view, the district court misapplied these precedents. It interpreted *Feist* and our subsequent holdings as erecting a high barrier of originality as a prerequisite to copyright protection, rather than, as *Feist* so emphatically stated, a minimal requirement.

The district court gave several reasons for its ruling that the Red Book failed the test for originality. First, the court stated, "Maclean Hunter has not persuasively demonstrated that the values published in the Red Book are anything more than interpretations or analyses of factual information.... While Maclean Hunter may have been the first to discover and report this material, the material does not 'owe its origin' to Maclean Hunt-

5. By contrast, we found no infringement in *Victor Lalli Enters. Inc. v. Big Red Apple, Inc.*, 936 F.2d 671 (2d Cir.1991), because the charts at issue were " 'purely functional grids that offer[ed] no opportunity for variation,' " and the author exercised "neither selectivity in what he reports nor creativity in how he reports it." *Id.* at 673 (quoting district court in part).

For other examples of cases upholding data selection as meeting copyright's originality requirement, *see* 1 William F. Patry, *Copyright Law and Practice* (1994). They include:

the choice of categories of Medicaid data to include in charts; the 'judgement and knowl-

edge of the author respecting the social standing and societal relations of a limited class of the general public;' a daily time organizer; the choice of 'true' public relations firms to include in a directory; a list of state tariffs on pay telephones; selection of the most important and helpful cross-streets and assignment of address numbers for the streets; information about cable television systems throughout the United States.... The key factor is the exercise of some editorial judgment in the selection of data.

*Id.* at 199–200.

er." (Citing *Feist,* 499 U.S. at 361, 111 S.Ct. at 1296; Op. at 16–17 (JA 656–57).)

■ The district court was simply mistaken in its conclusion that the Red Book valuations were, like the telephone numbers in *Feist,* pre-existing facts that had merely been discovered by the Red Book editors. To the contrary, Maclean's evidence demonstrated without rebuttal that its valuations were neither reports of historical prices nor mechanical derivations of historical prices or other data. Rather, they represented predictions by the Red Book editors of future prices estimated to cover specified geographic regions.[6] According to Maclean's evidence, these predictions were based not only on a multitude of data sources, but also on professional judgment and expertise. The testimony of one of Maclean's deposition witnesses indicated that fifteen considerations are weighed; among the considerations, for example, is a prediction as to how traditional competitor vehicles, as defined by Maclean, will fare against one another in the marketplace in the coming period. (JA 209–12.) The valuations themselves are original creations of Maclean.

■ Recognizing that "[o]riginality may also be found in the selection and ordering of particular facts or elements," the district court concluded that none had been shown. Op. at 17 (JA 657). This was because the Red Book's selection and arrangement of data represents "a logical response to the needs of the vehicle valuation market." *Id.* at 18 (JA 658). In reaching this conclusion, the district court applied the wrong standard. The fact that an arrangement of data responds *logically* to the needs of the market for which the compilation was prepared does not negate originality. To the contrary, the use of logic to solve the problems of how best to present the information being compiled is

independent creation. *See Feist,* 499 U.S. at 359, 111 S.Ct. at 1295 (originality is to be found unless the creative spark is so utterly lacking as to be "virtually nonexistent").

We find that the selection and arrangement of data in the Red Book displayed amply sufficient originality to pass the low threshold requirement to earn copyright protection. This originality was expressed, for example, in Maclean's division of the national used car market into several regions, with independent predicted valuations for each region depending on conditions there found. A car model does not command the same value throughout a large geographic sector of the United States; used car values are responsive to local conditions and vary from place to place. A 1989 Dodge Caravan will not command the same price in San Diego as in Seattle. In furnishing a single number to cover vast regions that undoubtedly contain innumerable variations, the Red Book expresses a loose judgment that values are likely to group together with greater consistency within a defined region than without. The number produced is necessarily both approximate and original. Several other aspects of the Red Book listings also embody sufficient originality to pass *Feist's* low threshold. These include: (1) the selection and manner of presentation of optional features for inclusion;[7] (2) the adjustment for mileage by 5,000 mile increments (as opposed to using some other breakpoint and interval); (3) the use of the abstract concept of the "average" vehicle in each category as the subject of the valuation; and (4) the selection of the number of years' models to be included in the compilation.

■ We conclude for these reasons that the district court erred in ruling that the Red

---

6. That they are expressed in numerical form is immaterial to originality. Original authorship warranting protection may be "fixed in any tangible medium of expression ... includ[ing] ... literary works." 17 U.S.C.A. 102(a) (West 1977). The Act broadly defines literary works to include "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols...." 17 U.S.C.A. § 101 (West 1977).

7. This selection includes far fewer than all extant options, and presents them in a manner that furnishes a single valuation to cover the particular option in numerous different vehicles. The editors make these choices to accommodate the practical space limitations imposed by the book's format, while providing the information most likely to satisfy customers' needs.

Book commands no copyright protection by reason of lack of originality.[8]

2. *The idea-expression dichotomy and the merger of necessary expression with the ideas expressed.* CCC's strongest argument is that it took nothing more than ideas, for which the copyright law affords no protection to the author. According to this argument, (1) each entry in the Red Book expresses the authors' *idea* of the value of a particular vehicle; (2) to the extent that "expression" is to be found in the Red Book's valuations, such expression is indispensable to the statement of the idea and therefore merges with the idea, so that the expression is also not protectible, and; (3) because each of Red Book's valuations could freely be taken without infringement, all of them may be taken without infringement. This was one of the alternate bases of the district court's ruling in CCC's favor.

■ The argument is not easily rebutted, for it does build on classically accepted copyright doctrine. It has been long accepted that copyright protection does not extend to ideas; it protects only the means of expression employed by the author. As the Supreme Court stated in *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954),

Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself. Thus, in *Baker v. Selden,* 101 U.S. 99 [25 L.Ed. 841] [(1879)], the Court held that a copyrighted book on a peculiar system of bookkeeping was not infringed by a similar book using a similar plan which achieved similar results where the alleged infringer made a

different arrangement of the columns and used different headings.

*Id.* at 217, 74 S.Ct. at 470 (footnote omitted).

■ It is also well established that, in order to protect the immunity of ideas from private ownership, when the expression is essential to the statement of the idea, the expression also will be unprotected, so as to insure free public access to the discussion of the idea. *See Kregos,* 937 F.2d at 705; *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971) ("When the 'idea' and its 'expression' are ... inseparable, copying the 'expression' will not be barred, since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law.").[9]

■ We nonetheless believe the district court erred in granting judgment to CCC. We reach this conclusion based on the need to balance the conflicts and contradictions that pervade the law of copyright, and the need, where elements of the copyright law conflict, to determine, as a policy judgment, which of its commands prevails over the other.

The fundamental principle of copyright, as expressed in the Copyright Clause of the Constitution, is to promote the advance of knowledge by granting authors exclusive rights to their writings.[10] As the Supreme Court said in *Mazer,* "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'"

---

8. The district court also believed that CCC did not infringe Red Book's original protected elements because CCC included Red Book's selection in a more extensive data base. We disagree. Original aspects of Red Book's ordination and arrangement were inextricably present whenever CCC copied and republished any Red Book valuation, because each valuation incorporated the Red Book editors' original judgment concerning the predicted value of that automobile, as well as their judgment as to geographic consistency within a region.

9. For more extensive discussions of the merger doctrine, *see* William F. Patry, *Copyright Law and Practice,* 312–325 (1994); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.03[A]–[B] (1994).

10. This essential formulation is found in England's Statute of Anne of 1710, which conceived the Anglo–American copyright. It is entitled, "An Act for the Encouragement of Learning, by Vesting the Copies of Printed Books in the Authors or Purchasers of Such Copies." The statute is reprinted in Patry, *supra,* at 1461–64.

347 U.S. at 219, 74 S.Ct. at 471. *See also Nimmer* at § 1.03[A]. The financial incentives to authors consist of exclusive rights to their writings, that may be sold or licensed for money, so that authors may earn a living from the creations that benefitted the public.

From an early time, however, courts, taking a different approach from that taken in the patent law, developed a theory which almost directly contradicted the original theory of copyright. The new theory was that ideas are too important to the advancement of knowledge to permit them to be under private ownership, and that open public debate, which is essential to a free democratic society, requires free access to the ideas to be debated.[11] *See* Patry, *supra*, at 122–23, 319, *Nimmer* at § 1.10[B] 1–71 to –74, 78–79, § 13.03[B] at 13–69 to –70. Judicially created doctrine thus led to a drastic limitation on the scope of copyright protection.[12] Ideas were not to be protected; only the manner of their "expression." This limitation came to be known as the "idea-expression" dichotomy.

The contradiction between these imperatives, one calling for the protection of creations that will advance the progress of knowledge, the second requiring that these same creations be free of protection, has understandably given rise to bewildering problems of interpretation as to whether copying has been of protected expression or of the unprotected ideas underlying the expression.[13] These difficulties led Judge Learned Hand to discourse in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), that takings from a protected source such as a copyrighted play can occur at varying levels of abstraction from the concrete realization of the original, and that the more remote in abstraction the taking is from the original, the less likely that it will constitute a taking of protected expression.[14] This has often been referred to as Hand's "abstractions test"; in fact, as Judge Hand and others have noted,[15] it is no test at all, but merely a way of perceiving the problem.[16]

**11.** As Nimmer explains:

The policy rationale underlying the Act's exclusion of ideas from copyright protection is clear. To grant property status to a mere idea would permit withdrawing the idea from the stock of materials that would otherwise be open to other authors, thereby narrowing the field of thought open for development and exploitation. This effect, it is reasoned, would hinder rather than promote the professed purpose of the copyright laws, i.e., "the progress of science and useful arts."

*Nimmer* § 13.03[B] at 13–69 to –70 (footnotes omitted).

**12.** This doctrine is codified in section 102(b) of the Copyright Act, which provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C.A. § 102(b) (West 1977).

**13.** As Judge Walker pointed out in *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 696 (2d Cir.1992), "the copyright law seeks to establish a delicate equilibrium. On the one hand, it affords protection to authors as an incentive to create, and, on the other, it must appropriately limit the extent of that protection so as to avoid the effects of monopolistic stagnation. In apply-

ing the federal act to new types of cases, courts must always keep this symmetry in mind."

**14.** His classic and oft-repeated formula was that:

Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

45 F.2d at 121.

**15.** "[A]s soon as literal appropriation ceases to be the test, the whole matter is necessarily at large, so that ... the decisions cannot help much in a new case." *Nichols*, 45 F.2d at 121. *See also Nash v. CBS, Inc.*, 899 F.2d 1537, 1540 (7th Cir.1990) ("Hand's insight is not a test at all. It is a clever way to pose the difficulties that require courts to avoid either extreme of the continuum of generality." (Easterbrook, J.)).

**16.** Hand himself, writing thirty years after his above-quoted formulation of the problem, eschewed any pithy solution of it. In his last copyright case, *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir.1960), he opined that: "Obviously, no principle can be stated as to when an imitator has gone beyond

This conflict between these contradictory thrusts recurs at the level of several more particular applications of the copyright law. Among them is the issue raised by this appeal of the protection, if any, to be accorded to compilations.[17] For if CCC's argument prevails, for reasons explained below, virtually nothing will remain of the protection accorded by the statute to compilations, notwithstanding the express command of the copyright statute.

Given the nature of compilations, it is almost inevitable that the original contributions of the compilers will consist of *ideas*.[18] Originality in *selection*, for example, will involve the compiler's idea of the utility to the consumer of a limited selection from the particular universe of available data. One compiler might select out of a universe of all businesses those that he believes will be of interest to the Chinese–American community, *see Key Publications*, 945 F.2d at 514, another will select those statistics as to racehorses or pitchers that are believed to be practical to the consumer in helping to pick winners, *see Kregos*, 937 F.2d at 706–07; *Wabash Publishing Co. v. Flanagan*, No. 89 Civ. 1923, 1989 WL 32939, 1989 U.S.Dist. LEXIS 3546 (N.D.Ill. Mar. 31, 1989) (particular selection and arrangement of information relevant to horse races found copyrightable); *Triangle Publications, Inc. v. New England Newspaper Publication Co.*, 46 F.Supp. 198, 201–02 (D.Mass.1942) (same); another will offer a list of restaurants he suggests are the best, the most elegant, or offer the best value within a price range.[19] Each of these exercises in selection represents an *idea*.

In other compilations, the original contribution of the compiler will relate to ideas for the coordination, or arrangement of the data. Such ideas for arrangement are generally designed to serve the consumers' needs, making the data more useful by increasing the ease of access to those data that answer the needs of the targeted customers, or dividing the data in ways that will efficiently serve the needs of more diverse groups of customers. For example, a listing of New York restaurants might be broken down by geographic areas of the city, specialty or type (e.g., seafood, steaks and chops, vegetarian, kosher, Chinese, Indian); price range; handicapped accessibility, etc.

It is apparent that virtually any independent creation of the compiler as to selection, coordination, or arrangement will be designed to add to the usefulness or desirability of his compendium for targeted groups of potential customers, and will represent an idea. In the case of a compilation, furthermore, such structural ideas are likely to be expressed in the most simple, unadorned, and direct fashion. If, as CCC argues, the doctrine of merger permits the wholesale copier of a compilation to take the individual expression of such ideas, so as to avoid the risk that an idea will improperly achieve protection, then the protection explicitly conferred on compilations by Section 103 of the U.S. Copyright Act will be illusory.

We addressed precisely this problem in *Kregos*, 937 F.2d 700. The plaintiff Kregos had created a form to be used to help predict the outcome of a baseball game by filling in nine statistics of the competing pitchers. The defendant contended, in terms similar to

copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc.*" *Id.* at 489. Thirty years after that, Judge Keeton wrote: "It seems the better part of wisdom, if not valor, not to press the search for a suitable bright-line test ... where Learned Hand, even after decades of experience in judging, found none." *Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F.Supp. 37, 60 (D.Mass.1990). *See also* Patry, *supra*, at 320 (dangerous to attempt to formulate broad rules in this area).

**17.** Another is the issue of the protection to be afforded to computer programs, as to which the recently conferred statutory protection is not easily reconciled with the judge-made, and statutorily adopted, principle that copyright protection does not "extend to any idea, procedure, process [or] system." 17 U.S.C. § 102(b). It is difficult to say what a computer program is, if not an idea, procedure, process or system. *See generally, Computer Assoc. Int'l, Inc. v. Altai*, 982 F.2d at 703–07.

**18.** Commentators have noted this dilemma. *See, e.g.* Jane C. Ginsburg, *No "Sweat"? Copyright and Other Protection of Works of Information After Feist v. Rural Telephone*, 92 Colum.L.Rev. 338, 346 (1992).

**19.** For a more exhaustive list of compilations upheld as original, *see* Patry, *supra*, at 199–200.

CCC's argument, that the copyright owner's idea was the utility of the nine selected statistics in helping a fan predict the outcome, and that the idea was merged in the expression of it—in the copyrighted form that listed those nine statistics. Judge Newman wrote:

> In one sense, every compilation of facts can be considered to represent a merger of an idea with its expression. Every compiler of facts has the idea that his particular selection of facts is useful. If the compiler's idea is identified at that low level of abstraction, then the idea would always merge into the compiler's expression of it. Under that approach, there could never be a copyrightable compilation of facts.[20]

*Kregos*, 937 F.2d at 706.

Recognizing that the purpose of the doctrine of merger of expression with idea is to insure that protection not extend to ideas, the *Kregos* opinion went on to describe different categories of ideas. It distinguished between, on the one hand, those ideas that undertake to advance the understanding of phenomena or the solution of problems, such as the identification of the symptoms that are the most useful in identifying the presence of a particular disease; and those, like the pitching form there at issue, that do not undertake to explain phenomena or furnish solutions, but are infused with the author's taste or opinion. *Kregos* postulated that the importance of keeping ideas free from private ownership is far greater for ideas of the first category, directed to the understanding of phenomena or the solving of problems, than for those that merely represent the author's taste or opinion and therefore do not materially assist the understanding of future thinkers.[21] As to the latter category, the opinion asserted that, so long as the selections reflected in the compilation "involve matters of taste and personal opinion, there is no serious risk that *withholding the merger doctrine*," 937 F.2d at 707 (emphasis added), would inflict serious injury on the policy underlying the rule that forbids granting protection to an idea. This was in contrast to analyses belonging to the first category—building blocks of understanding—as to which "protecting the [necessary] 'expression' of the selection would clearly risk protecting the idea of the analysis." *Id* at 707.[22] Because Kregos's idea was of the soft type infused with taste or opinion, the court withheld application of the merger doctrine, permitting Kregos to exercise ownership. It accomplished this by assigning to the idea a different level of abstraction from the expression of it, so that the merger doctrine would not apply and the copyright owner would not lose protection.[23] ("His 'idea,' for purposes

**20.** Judge Newman might have omitted the last two words. For the reasoning he discusses would destroy all protection for compilations of ideas as well as for compilations of facts.

**21.** *See also Eckes*, 736 F.2d at 863 (upholding finding of infringement because list of premium cards "subjectively based").

**22.** This dichotomy between types of ideas is supported by the wording of various legislative pronouncements, which seem uniformly to contemplate denying protection to building-block ideas explaining processes or discoveries, and do not refer to expressions of subjective opinion. Thus, § 102(b) denies protection to any "idea, procedure, process, system, method of operation, concept, principle, or discovery." 37 C.F.R. § 202.1(b), in similar terms, denies protection to "[i]deas, plans, methods, systems, or devices, as distinguished from the particular manner in which they are expressed or described in a writing." Copyright Office Circular 31 maintains that "Copyright protection is not available for "ideas or procedures for doing, making, or building things; scientific or technical methods or discoveries; business operations or procedures; mathematical principles; formulas, algorithms; or any concept, process [or] method of operation."

**23.** Professor Robert Gorman has written that protection of compilations is more strongly suggested where the "works are more fanciful than functional, and where the selection criteria are driven by subjective and evaluative judgement ..." Robert A. Gorman, *The* Feist *Case: Reflections on a Pathbreaking Copyright Decision*, 18 Rutgers Computer & Tech.L.J. 731, 751 (1992). *See also* Ginsburg, *supra*, at 345. *Compare Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (denying protection to historical theory explaining destruction of Hindenburg dirigible) *with Eckes*, 736 F.2d at 863 (granting protection to identification of "premium" baseball cards because of personal subjectivity of the selection). The *Hoehling* opinion justified the denial of protection to historical analysis on the theory that "[k]nowledge is expanded ... by granting new authors of historical works a relatively free hand to build upon the work of their predecessors." 618 F.2d at 980.

of the merger doctrine, remains the general idea that statistics can be used to assess pitching performance rather than the precise idea that his selection yields a determinable probability of outcome." 937 F.2d at 707.)

*Kregos,* thus, makes a policy judgment as between two evils. Unbridled application of the merger doctrine would undo the protection the copyright law intends to accord to compilations. Complete failure to apply it, however, would result in granting protection to useful ideas.[24] *Kregos* adopts a middle ground. In cases of wholesale takings of compilations, a *selective* application of the merger doctrine, withholding its application as to soft ideas infused with taste and opinion, will carry out the statutory policy to protect innovative compilations without impairing the policy that requires public access to ideas of a more important and useful kind.[25]

Application of the *Kregos* approach to our facts leads us to the conclusion that the district court should, as in *Kregos,* have *"withheld"* the merger doctrine. As a matter of copyright policy, this was not an appropriate instance to apply the merger doctrine so as to deprive Red Book of copyright protection. The consequences of giving CCC the benefit of the merger doctrine are too destructive of the protection the Act intends to confer on compilations, without sufficient benefit to the policy of copyright that seeks to preserve public access to ideas.

█ In the first place, the takings by CCC from the Red Book are of virtually the entire compendium. This is not an instance of copying of a few entries from a compilation. This copying is so extensive that CCC effectively offers to sell its customers Maclean's Red Book through CCC's data base. CCC's invocation of the merger doctrine to justify its contention that it has taken no protectible matter would effectively destroy all protection for Maclean's compilation.[26]

Secondly, the valuations copied by CCC from the Red Book are not ideas of the first, building-block, category described in *Kregos,* but are rather in the category of approximative statements of opinion by the Red Book editors. To the extent that protection of the Red Book would impair free circulation of

**24.** Discussing merger in the context of computer programs, Nimmer points out that "[t]his line [for determining when an idea has become sufficiently delineated to warrant copyright protection] is a pragmatic one, drawn not on the basis of some metaphysical property of 'ideas,' but by balancing the need to protect the labors of authors with the desire to assure free access to ideas." Nimmer, § 13.03[F] at 13–128.

**25.** *See Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971) ("The guiding consideration in drawing the line is the preservation of the balance between competition and protection reflected in the patent and copyright laws. What is basically at stake is the extent of the copyright owner's monopoly—from how large an area of activity did Congress intend to allow the copyright owner to exclude others?"); *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1464 (5th Cir.) *cert. denied,* 498 U.S. 952, 111 S.Ct. 374, 112 L.Ed.2d 336 (1990) ("To extend protection ... would be to grant Kern River a monopoly of the idea for locating a proposed pipeline in the chosen corridor, a foreclosure of competition that Congress could not have intended to sanction through copyright law...."") *See also Nash v. CBS, Inc.,* 899 F.2d 1537, 1540–42 (7th Cir.1990); *Lotus Dev. Corp. v. Paperback Software Int'l.,* 740 F.Supp. 37, 60–61 (D.Mass.1990); *Nimmer,* § 13.03[B] at 13–78–80; Patry, *supra,* at 314–17.

Indeed, courts have consistently ruled in a manner that supports the distinction made in *Kregos.* *Compare Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1880), and *Kern River, supra,* (copyright protection denied, based on merger doctrine, respectively to a system of double entry bookkeeping and the designation of the best available pipeline route from Wyoming to California), *with Eckes, supra,* and *Key, supra,* (granting protection to the identification of premium baseball cards and business establishments likely to be of interest to the Chinese–American community).

**26.** In this circuit, consideration of the merger doctrine takes place in light of the alleged copying to determine if infringement has occurred, rather than in analyzing the copyrightability of the original work. *Kregos,* 937 F.2d at 705; *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 916 (2d Cir.1980). This approach is applauded by Nimmer as the "better view." 13.03[B] at 13–76 to –78. As we noted in *Kregos,* "[a]ssessing merger in the context of alleged infringement will normally provide a more detailed and realistic basis for evaluating the claim that protection of expression would inevitably accord protection to an idea." *Kregos,* 937 F.2d at 705. In the instant case, for example, it is of consequence that we are confronted with wholesale copying *of* a compilation rather than some more limited copying *from* a compilation.

any ideas, these are ideas of the weaker category, infused with opinion; the valuations explain nothing, and describe no method, process or procedure. Maclean Hunter makes no attempt, for example, to monopolize the basis of its economic forecasting or the factors that it weighs; the Red Book's entries are no more than the predictions of Red Book editors of used car values for six weeks on a rough regional basis. As noted above, Red Book specifies in its introduction that "[y]ou, the subscriber, must be the final judge of the actual value of a particular vehicle. Any guide book is a supplement to and not a substitute for expertise in the complex field of used vehicle valuation." This language is remarkably similar to our observation in *Kregos,* that the author "has been content to select categories of data that he obviously believes have some predictive power, but has left it to all sports page readers to make their own judgments as to the likely outcomes from the sets of data he has selected." 937 F.2d at 707.

The balancing of interests suggested by *Kregos* leads to the conclusion that we should reject CCC's argument seeking the benefit of the merger doctrine.[27] Because the ideas contained in the Red Book are of the weaker, suggestion-opinion category, a withholding of the merger doctrine would not seriously impair the policy of the copyright law that seeks to preserve free public access to ideas. If the public's access to Red Book's valuations is slightly limited by enforcement of its copyright against CCC's wholesale copying, this will not inflict injury on the opportunity for public debate, nor restrict access to the kind of idea that illuminates our understanding of the phenomena that surround us or of useful processes to solve our problems.[28] In contrast, if the merger doctrine were applied

so as to bar Maclean's enforcement of its copyright against CCC's wholesale takings, this would seriously undermine the protections guaranteed by § 103 of the Copyright Act to compilations that employ original creation in their selection, coordination, or arrangement. It would also largely vitiate the inducements offered by the copyright law to the makers of original useful compilations.

■ *3. Public domain.* We disagree also with the district court's ruling sustaining CCC's affirmative defense that the Red Book has fallen into the public domain. The district court reasoned that, because the insurance statutes or regulations of several states establish Red Book values as an alternative standard, *i.e.,* by requiring that insurance payments for total losses be at least equal either to Red Book value or to an average of Red Book and Bluebook values (unless another approved valuation method is employed),[29] the Red Book has passed into the public domain. The argument is that the public must have free access to the content of the laws that govern it; if a copyrighted work is incorporated into the laws, the public need for access to the content of the laws requires the elimination of the copyright protection.

No authority cited by CCC directly supports the district court's view. It relied on *Building Officials & Code Adm. v. Code Tech. Inc.,* 628 F.2d 730 (1st Cir.1980) ("BOCA"), which the Magistrate Judge found "virtually indistinguishable" from our case. Although the First Circuit Court of Appeals, in *BOCA,* indeed expressed sympathy with the arguments here advanced by CCC, its ruling is not a holding to that effect. The Court of Appeals merely vacated a preliminary injunction, expressing doubts as to the

---

27. As Nimmer points out, "There can be no First Amendment justification for the copying of expression along with idea simply because the copier lacks either the will or the time or energy to create his own independently evolved expression. The first amendment ... does not offer a governmental subsidy at the expense of authors whose well-being is also a matter of public interest." *Nimmer, supra,* § 1.10[D] at 1–98 to –98.1.

28. Others, including CCC, remain free to value used cars and to profit from their valuations. They are barred only from wholesale copying of

what is original to the authors of the Red Book. As the Supreme Court said in *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954), "respondents may not exclude others from using statuettes of human figures in table lamps; they may only prevent use of copies of their statuettes as such or as incorporated in some other article." 347 U.S. at 218, 74 S.Ct. at 470.

29. *See* N.J.Admin.Code 11:3–10.4 (1988); 11 N.Y.Admin.Code § 216.7(c) (1990).

plaintiff copyright holder's likelihood of success, and remanding for a full hearing on whether the plaintiff had lost its copyright protection by reason of the adoption of its previously protected work (a construction code) as part of the laws of Massachusetts.

We are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright. While there are indeed policy considerations that support CCC's argument, they are opposed by countervailing considerations. For example, a rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution. We note also that for generations, state education systems have assigned books under copyright to comply with a mandatory school curriculum. It scarcely extends CCC's argument to require that all such assigned books lose their copyright—as one cannot comply with the legal requirements without using the copyrighted works. Yet we think it unlikely courts would reach this conclusion. Although there is scant authority on CCC's argument, Nimmer's treatise opposes such a suggestion as antithetical to the interests sought to be advanced by the Copyright Act. *See Nimmer* § 5.06[C] at 5–60.[30]

### Conclusion

Because Maclean has demonstrated a valid copyright, and an infringement thereof, we direct the entry of judgment in Maclean's favor. We remand to the district court for further proceedings.

---

30. Nimmer argues that the adoption of a private work into law might well justify a fair use defense for personal use, but should not immunize a competitive commercial publisher from liability since this would "prove destructive of the copyright interest in encouraging creativity in connection with the increasing trend toward state and federal adoptions of model codes." *Nimmer,* § 5.06[C] at 5–60.