**LYNX VENTURES, LLC, d/b/a FORESTWORLD Plaintiff**

v.

**Richard MILLER and the Wood Exchange, LLC Defendants**

No. 2:02–CV–17.

United States District Court, D. Vermont.

Feb. 8, 2002.

Craig Weatherly, Gravel and Shea, Burlington, VT, for Lynx Ventures, LLC dba Forestworld, plaintiffs.

Elizabeth Hawkins Miller, Esq., Spink & Miller, PLC, Burlington, VT, for Richard Miller, the Wood Exchange, LLC, defendants.

### OPINION AND ORDER

SESSIONS, District Judge.

This dispute involves two companies who have produced competing electronic databases describing commercial wood species. Lynx Ventures ("Lynx") brought this action against Richard Miller and The Wood Exchange alleging that Miller's wood database, entitled The Wood Explorer ("TWE"), infringes on Lynx's copyright for its own wood database, Woods of the World ("WOW"). Lynx also claims that Miller has breached a contract he entered into with Lynx at the time of his departure from WOW. On January 22, 2002, the Court denied Lynx's request for a temporary restraining order preventing Miller and The Wood Exchange from infringing on its copyright in WOW and breaching the contract. (Paper 2, 4). A preliminary injunction hearing was held on January 25, 2002. For the reasons described below, the Court DENIES Lynx's request for a preliminary injunction preventing continued infringement and breach of contract.

### I. FACTS

In 1993 Miller began work on WOW, a searchable electronic database on the world's commercial wood species. The database was designed to serve as a reference source for purchasers of wood and wood products. Along with a handful of hired students Miller gathered information on wood species from the public domain and published sources, including books, periodicals, magazines, and other websites, and incorporated this data into WOW. Miller included photos, taken with permission from the United States Forest Products Laboratory, of different wood species. Miller also created distribution maps for species for which such maps were otherwise unavailable.

WOW is available to the public on the internet and may be purchased in a compact disc ("CD") format. It provides information on just over 800 species of trees and contains 5000 unique maps and 650 wood images. It provides information organized into five different categories: species data, common uses, numerical data, wood photos, and maps. Within these general categories users can find information on, among other things, heartwood, sapwood, and grain characteristics, common uses and names, geographic distribution, environmental profile, product sources, response to mechanical stressors, and physical characteristics of a particular species.

In October 2000 ForestWorld.com, Inc., the company that Miller founded to create

WOW, defaulted on a loan obligation to Reginald Gignoux, Arthur Berndt, and Green Mountain Capital, L.P. Forest-World.com, Inc. conveyed to Gignoux, Berndt, and Green Mountain Capital, L.P. the assets of ForestWorld.com, Inc., including WOW. ForestWorld.com, Inc. filed for registration of its copyright in WOW on January 10, 2002.

Miller remained with ForestWorld.com until December 2000. Upon his departure from ForestWorld.com, Miller entered into a Memorandum of Understanding ("MOU") with ForestWorld.com, Inc. (Paper 3, Ex. B). In the MOU Miller acknowledged that ForestWorld.com was the owner of "the copyright and all rights in and to WOW." MOU ¶ 6. Miller also agreed to cease his involvement in any WOW-related sales after November 30, 2000 and to return all "documents, master discs, and supplies relating to WOW" by December 1, 2000. MOU ¶ 3. However, Miller retained the right to publish print books based on the WOW material. MOU ¶ 2. To this end Miller retained Excel spreadsheet data used in WOW. The MOU did not contain a non-compete provision.

In December 2000, Miller began constructing a new database, TWE, and a new web site, The Wood Exchange. These products are produced by Miller's new business, The Wood Exchange, LLC. In doing so, Miller again hired students to collect information and create a new comprehensive spreadsheet as he had for WOW. However, Miller also relied upon the previously collected data included in the WOW spreadsheets. Miller admits that some of the data contained in TWE is identical or extremely similar to that in WOW and that he may have copied some

of this data from the WOW spreadsheet into the TWE spreadsheet. Miller did not use the distribution maps and movies found on WOW because he felt these materials were original creations for WOW. TWE came on line at The Wood Exchange website in late 2001. The Wood Exchange, LLC is currently poised to begin sale of CD versions of TWE.

Like WOW, TWE is a searchable database of wood species and contains many of the same kinds of data. However, it includes data on over 1600 species and relies on approximately ten times more reference sources for its data.[1] TWE contains over 2000 wood images and 10,000 unique maps. Unlike WOW, TWE is interactive and requests users to add their own information to TWE for most of the data points. It also displays much of the same data available in WOW in bar chart format, as opposed to textual format, based on the number of references for a particular fact or characteristic. This format provides users with a quantitative measure of the fact or characteristic.

Lynx argues that Miller has infringed on its copyright in WOW by copying the WOW data and using it as a baseline upon which to build TWE. Lynx identifies five areas in which it argues that TWE is identical to WOW: geographic distribution, heartwood color, common uses, physical/mechanical characteristics, and wood photographs. As evidence of the copying Lynx has provided printouts of data for specific species from TWE, as available at The Wood Exchange website, and from WOW, as available from its website. These printouts show textual descriptions of geographic distribution and heartwood color that are nearly identical for the same

1. At the hearing Miller indicated that the large increase in information included in TWE resulted from the exponential increase in available data between 1993 when he first began working on WOW and 2000 when he initiated work on TWE. Particularly important to this increase was the amount of information available through the internet in 2000.

species in each database. In each of the printouts all of the common uses listed in WOW are also listed in TWE for the same species.[2] Similarly, in the printouts from both databases the tables of physical/mechanical characteristics use the same categories of data in the same order along the first column of the tables. Moreover, in the printouts of these tables are missing data for the same categories in each species. Finally, Miller acknowledges that TWE contains the 650 photographs also found in WOW that are taken, with permission, from the United States Forest Products Laboratory.

## II. DISCUSSION

▮ To establish a right to a preliminary injunction Lynx must show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor. *See Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)). In cases where copyright infringement is demonstrated, irreparable harm is generally presumed. *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985).

To prove a claim of copyright infringement under the Copyright Act, 17 U.S.C. § 501 *et seq.*, Lynx must prove that (1) it has a valid copyright in the work allegedly infringed and (2) Miller infringed upon its copyright by copying protected elements of Lynx's work. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir.2001) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Thus, Lynx must prove that WOW has been copyrighted, that the allegedly copied elements of WOW are sufficiently original to be protected by the copyright, that actual copying of these elements has occurred, and that there is substantial similarity between TWE and the protectable elements of WOW. *See id.* at 267–273; *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir.2001).

### A. Protectability of WOW and the Allegedly Copied Elements

▮ In this case the parties do not dispute that Lynx holds a valid copyright in WOW and Miller has apparently conceded that WOW is protectable as a whole under this copyright.[3] However, "[s]imply because a work is copyrighted does not mean every element of that work is protected." *Boisson*, 273 F.3d at 268. The law of copyright protects only "original works of authorship." 17 U.S.C.A. § 102(a) (West 1996). The majority of WOW consists of factual data on various tree species. Facts are considered to be in the public domain and thus are not protectable under copyright law. *Feist*, 499 U.S. at 347, 111 S.Ct. 1282; *Lipton v.*

---

**2.** However, the TWE database often contains a large number of additional common uses not listed on WOW. Miller Aff. ¶ 30, Exs. A, B, C.

**3.** During the preliminary injunction hearing Miller stated that he believed that WOW was copyrighted when he transferred ownership to Lynx but that he did not recall obtaining a certificate of copyright registration for WOW. In the MOU, Miller agreed to transfer his copyright in WOW to Lynx. Lynx filed for its own certificate of copyright registration in January 2002. At this stage it is unclear what the status of the WOW copyright was at the time WOW first came on-line through the filing of the present action by Lynx. However, the parties do not dispute that Lynx owns a valid copyright in WOW and the Court will assume that Lynx has met the "ownership of a valid copyright requirement" for the purposes of the copyright infringement claim.

658

*The Nature Co.*, 71 F.3d 464, 470 (2d Cir. 1995); *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir.1991).

However, factual compilations may be copyrighted. 17 U.S.C.A. § 103 (West 1996). A compilation is defined by the Copyright Act as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C.A. § 101 (West.Supp.2001). In this case, Lynx has focused on five areas of data included in WOW (geographic distribution, heartwood color, common uses, physical/mechanical characteristics, and wood photographs) that it argues are original aspects of WOW. Lynx's argument at its most basic is that by copying these elements of WOW, Miller has infringed on its copyright in WOW as a whole. However, each of these elements is itself a compilation of facts. Thus the Court must determine whether these elements are compilations protected by copyright.

■ In order to qualify for copyright protection, a compilation must meet three requirements: "(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work." *Key Publ'ns*, 945 F.2d at 512 (citing *Feist*, 499 U.S. at 357, 111 S.Ct. 1282). Every compilation by definition meets the first criteria, thus the important question is whether the compilation "features an original selection or arrangement of [those] facts." *Feist*, 499 U.S. at 350, 111 S.Ct. 1282.

■ The originality requirement does not create a high bar. "Original, ..., means only that the work was indepen-

dently created by the author ... and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345, 111 S.Ct. 1282; *accord Lipton*, 71 F.3d at 470 ("The amount of creativity required for copyright protection of a compilation is decidedly small.") To be original, the "work [must] come[ ] from the exercise of the creative powers of the author's mind, in other words, the fruits of [the author's] intellectual labor." *Boisson*, 273 F.3d at 268 (citation and internal quotations).

■ "Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation." *Key Publ'ns*, 945 F.2d at 512 (finding original selectivity where selector had to choose from a multitude of businesses and excluded certain businesses from the directory). *See also Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir.1984) (finding original selectivity where 5000 "premium" baseball cards were chosen from among 18,000 baseball cards). An arrangement "refers to the ordering or grouping of data into lists or categories that go beyond mere mechanical grouping of data as such, for example, the alphabetical, chronological, or sequential listings of data." *Key Publ'ns*, 945 F.2d at 513–14 (citation omitted).

■ The species distribution and heartwood data are presented in both databases in textual form. The Court agrees that the sentences and paragraphs of text describing species distribution and heartwood color authored by Miller for WOW demonstrate the requisite level of originality in coordinating and arranging the underlying facts. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir.1999) ("Descriptions of facts afford even more room for originality [than compilations]."). However, copyright protection is only available when the

sentences and paragraphs are not copied from another source. *See Feist,* 499 U.S. at 345, 111 S.Ct. 1282 ("Original, as the term is used in copyright, means only that the work was *independently created by the author* ...") (emphasis added). In this case Miller testified that the examples of copied text cited by Lynx contain identical phrases to public sources of tree distribution and heartwood color. (Def.'s Hr'g Exs. B, C). However, Miller did not demonstrate that each of the examples of identical text came from public sources.

 The copyrightability of the common uses lists and physical/mechanical characteristic tables, is less obvious. Lynx argues that the selection of common uses for each species is protected because "there must have been an exercise of judgment by Mr. Miller in developing [WOW] concerning the uses that should be considered 'common.'" Pl.'s Supp. Mem. of Law in Support of Mot. for Prelim. Inj. at 8. (Paper 10). There is no evidence of whether the selection process involved the creative selection envisioned by Lynx or whether it involved the "slavish" inclusion of every use listed as "common" by other references. *Cf. Key Publ'ns,* 945 F.2d at 513 (defendant could not show that plaintiff "slavishly" included every business about which she had information in her web page when plaintiff testified as to her use of judgment in excluding certain businesses).[4] The Court cannot infer without more that the common uses lists are an original selection.

Moreover, that the process may have been arduous and time-consuming is not sufficient to meet the originality requirement. *See Feist,* 499 U.S. at 359–60, 111 S.Ct. 1282 (noting that the "sweat of the brow" doctrine of copyright protection has been discredited). Similarly, the mechanical arrangement of the common uses in a single and "loosely alphabetical" list does not suggest the requisite creativity to qualify as an original arrangement. *Id.* at 363, 111 S.Ct. 1282 (alphabetical listing of names in a phonebook was not "remotely creative"). Thus, Lynx has not produced evidence sufficient for the Court to find copyright protection.

The tables of physical/mechanical wood characteristics may be protectable for two reasons: they may include copyrightable numerical data and they may constitute a copyrightable arrangement of data in categories. The numbers presented in the WOW tables meet the requirement of originality in selection. Miller stated that the numbers were calculated from a range of numbers available from other sources in the field. The selection and calculation of the numerical values involved the minimum level of creativity necessary to be original. *See CCC Information Serv., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 67–68 (2d Cir.1994) (predicted used car resale values based on variety of data sources, professional judgment, and expertise copyrightable).

 The categories or arrangement of numerical data included by the WOW tables, is a closer question. Lynx argues that many other characteristics of wood could have been included in addition to the ones chosen by Miller and that this indicates an original selection. *Cf. Schoolhouse, Inc. v. Anderson,* 275 F.3d 726, 730 (8th Cir.2002) (selection of all categories generally applicable to the subject matter creates insufficient originality for copyright). However, Lynx has not provided any evidence of such other relevant char-

---

4. While it is true that Lynx's burden is complicated by the fact that Miller is both the creator of WOW and the defendant in this case, it failed to sufficiently pursue this issue during cross-examination.

acteristics or that Miller decided not to choose these other categories. It also did not demonstrate that the categories included in WOW are themselves in some way original to Miller. *Cf. id.* (use of obvious labels for categories creates insufficient originality). With regard to arrangement, the ordering of the categories does not present any obvious arrangement, and the defendants have not suggested that one exists. In fact, they have not argued that the arrangement of the categories involved any thought-process at all on Miller's part.

 Finally, with regard to the photographs, the evidence showed that these photographs were taken with permission from the United States Forest Products Laboratory by Miller in creating WOW. Lynx presented no evidence that the selection of these photographs involved any exercise of skill, judgment, or subjective decision-making on the part of Miller. For example, there is no evidence that the photographs were selected from a multitude of photographs including photographs of species not contained in WOW. Similarly, there is no evidence that the photographs selected for each species were selected from a multitude of different photographs for that species.

There is also no evidence that the photographs[5] were arranged in an original manner. Instead, it appears from the examples provided in the record that the photograph corresponding to each species was routinely pasted into the web page or linked to the Excel spreadsheet row corresponding to that species. While this process may have been time-consuming, it does not involve creativity. The non-linear nature of a searchable database makes it more difficult to apply the unprotected

age-old and mechanical arrangements (alphabetical, chronological, sequential) identified by the Court in *Key Publ'ns* to the arrangement of the photographs in WOW. However, in this case such an arrangement is one that, while not "an age-old practice," would be "expected as a matter of course." *Feist*, 499 U.S. at 363, 111 S.Ct. 1282 (noting also that "[t]he selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever.") at 362. The arrangement of the photographs does not possess the requisite minimal degree of creativity.

## B. Infringement: Actual Copying and Substantial Similarity

The analysis above indicates that the only protectable elements of WOW at issue in this case are the sentences and paragraphs that Miller allegedly copied into TWE and the numerical data on physical and mechanical characteristics. To evaluate whether TWE has infringed on the protectable elements of WOW, Lynx must show that Miller actually copied these compilations and that as a result TWE and WOW have been made substantially similar.

 Actual copying of the protectable elements may be established by direct or indirect evidence. *Boisson*, 273 F.3d at 267. Indirect evidence that may be used includes "proof of access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Id.* (citing *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 747 (2d Cir.1998)) (internal quotations omitted). In this case Miller admits that he added

5. Moreover, there is no suggestion that these photographs were somehow altered by WOW to create an original work. One of the examples provided by Lynx, however, showed that

Miller had altered the photograph included in TWE. Pl.'s Hr'g Ex. 1 at 32 (Lightwood, *Buchanania muelleri* ).

data from the WOW spreadsheet he had in his possession into the spreadsheet that formed the basis of TWE. He also admits that some of this WOW data may have been copied into TWE. With regard to the heartwood data he states that he did include statements from WOW when he believed the facts were accurate. Miller Aff. ¶ 44. In addition, there is striking consistency in the phrases and hyphenated words, the typographical errors, and the sentence structure present in the distribution and heartwood text of the two databases. This evidence is sufficient to meet Lynx's burden of actual copying with regard to the distribution and heartwood color elements.

With regard to the numerical data, there is consistency in the blank spaces in tables for the same species. That is, where WOW contains no data value, TWE also contains no data value for the same species. However, despite this consistency in missing data, the values listed in TWE are completely different from those in WOW. Miller testified that these differences were due to the fact that he recalculated the values and based the recalculations on values in addition to those used in WOW. In addition, the consistency in blanks between the tables is not necessarily a result of copying. Miller asserts that the similarity is due to the fact that data is simply not available for the particular species. For these reasons, the Court cannot find that actual copying of the numerical values occurred.

 The standard test for determining substantial similarity is the "ordinary observer test." *Boisson*, 273 F.3d at 272. Under this test the question is "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other." *Nihon*, 166 F.3d

at 71. In the case of compilations, such as WOW, a "more discerning" test is used because the work is not completely original but includes unprotected public domain elements. *Boisson*, 273 F.3d at 272; *Key Publ'ns*, 945 F.2d at 514. Under this more discerning test, the substantial similarity test is limited to the particular original selection or arrangement afforded protection and does not extend to the facts themselves. *Feist*, 499 U.S. at 350, 111 S.Ct. 1282; *Boisson*, 273 F.3d at 272; *Key Publ'ns*, 945 F.2d at 514.

 However, as the Second Circuit recently explained in *Boisson*, the more discerning test does not require the Court to "dissect the works at issue into separate components and compare only the copyrightable elements." *Boisson*, 273 F.3d at 272. Instead the test is "guided by comparing the 'total concept and feel' of the contested works." *Id.* (quoting *Knitwaves Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir.1995)). The "total concept and feel" of the works must be informed by common sense. *Id.* at 273.

*Boisson* involved alleged infringement of two "alphabet" quilt designs that had each been copyrighted.[6] The more discerning test was necessary because the alphabet itself is within the public domain. *Boisson*, 273 F.3d at 272. In evaluating the claim of infringement, the Court first identified the copyrightable elements of the quilts—the color scheme and the alphabet layout. *Id.* at 269–71. In evaluating substantial similarity between the copyrighted quilt designs and the allegedly infringing quilts, the Court evaluated the overall sameness of the quilts as a whole. *Id.* at 273–75. The Court found that the defendant's quilts were substantially similar to one of the plaintiff's two quilt designs. As for the other copyrighted quilt design, the Court found that while some of the pro-

---

**6.** The alphabet quilts feature an arrangement of the letters of the alphabet in order in rows.

tectable elements were similar between one of the copyrighted quilts and the allegedly infringing quilts, these similarities were trivial and the quilts as a whole were not substantially similar to each other. *Id. See also Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir.1996) (if the similarities between the protected elements and the allegedly infringing work "are of small import quantitatively or qualitatively, the defendant will be found innocent of infringement"). It thus found that the copyright of that quilt design had not been infringed. *Boisson,* 273 F.3d. at 273–275.

■ In this case, it is clear that there are substantial qualitative and quantitative similarities between the paragraphs and sentences used to describe tree distribution and heartwood color in each database. Lynx states that its review of the tree distribution data showed that hundreds of the species included in TWE contained virtually identical descriptions. However, these similarities, when placed in the context of the "total concept and feel" of the works would not cause the average lay observer to conclude that one database was copied from the other.

The textual descriptions at issue are a minute portion of the total amount of information available in each database.[7] *See Nihon,* 166 F.3d at 71 (where defendant copied only the first paragraph of plaintiff's six paragraph article, allegedly infringing article was not substantially similar); *Schoolhouse,* 275 F.3d at 730 (no substantial similarity in arrangement of topics in the work as a whole where defendant's website made use of only 74% of the categories used in plaintiff's paper table).

While there is a great deal of factual overlap between the two databases, this overlap is unavoidable because both are comprehensive factual compilations on the same subject matter. Even so, TWE contains data on twice the number of species contained in WOW. Miller Aff. ¶ 15. Assuming all the information for the species in common to both databases were identical in selection and arrangement, and copyrightable, only 50% of the databases as a whole would be the same.

Moreover, as Lynx's own witness noted, the layout or format of the databases and corresponding web sites are quite different. *See Schoolhouse,* 275 F.3d at 730 (no substantial similarity in part because the formats of allegedly infringing website and plaintiff's paper table were very different). According to Miller, TWE is designed to give users an accurate portrayal of the range of data in the literature instead of providing definitive statements about characteristics and facts that are not clearly established. Miller Aff. ¶¶ 21–22. Thus, TWE provides numerous opportunities for users to add their own data to the databases. It also features different and a larger number of maps, charts, and wood images, as well as significantly different comparative data analysis formats. Miller Aff. ¶¶ 15, 23, 48; Def.'s Hr'g Ex. D. In sum, even though TWE contains some protected elements of WOW that have been copied, the two databases cannot be said to be substantially similar.

## C. Lynx's Contract Claim

Lynx also requests a preliminary injunction against continued breach of the MOU

---

**7.** This is true even if the baseline comparison is made to the section of the database in which the textual elements appear. Each heartwood description in TWE includes a bar chart providing a quantitative assessment of how often various color descriptions are attributed to the species by the literature. Moreover, the remainder of the page provides similar bar charts for sapwood color and grain that is different from the textual sapwood and grain descriptions provided in WOW. Similarly, while the species distribution text is identical in WOW and TWE, the pages displaying this data include a variety of other nonidentical information.

based on Miller's use of the WOW spreadsheet data to produce a product that is not a printed book. Lynx argues that it faces irreparable harm from continued use of this material in breach of the MOU. However, Lynx has not shown that this harm will be irreparable. At this point the Court has no reason to believe that any damages to Lynx will not be completely compensable at a later date if Lynx prevails at trial on its contract claim. On this basis, the Court finds Lynx is not entitled to a preliminary injunction to prevent further breach. As a result, it need not also consider whether Lynx has shown a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships in its favor.

## III. CONCLUSION

WHEREFORE, the Court DENIES Lynx's motion for a preliminary injunction (Paper 2).