WIENER, Circuit Judge,
joined by KING, Chief Judge, and PATRICK E. HIGGINBOTHAM, W. EUGENE DAVIS, CARL E. STEWART, and DENNIS, Circuit Judges, dissenting:
Technical codes and standards have become necessary, pervasive, and indispensable ingredients of Twenty-First Century life in this country; regrettably, today’s majority opinion has a real potential of drastically changing the societal landscape through that opinion’s predictably deleterious effects on these codes and standards, their authors, and the public and private entities that daily use and depend on them. Despite efforts to clothe its ruling in classic copyright lingo — “public domain,” “fact/expression,” “merger” — in holding for Veeck under the discrete facts of this case, the majority had to (and did) adopt a per se rule that a single municipality’s enactment of a copyrighted model code into law by reference strips the work of all copyright protection, ipso facto. Firmly believing that for this court to be the first federal appellate court to go that far is imprudent, I respectfully dissent.
I. FACTS AND PROCEEDINGS
As the underlying facts are undisputed, I adopt the majority opinion’s detailed recitation of the facts, supplementing it with the following observations contained in the record. The technical codes here at issue are not mere compilations; rather they are original, “from scratch” creations by SBCCI which rightfully enjoy copyright protection from their inceptions. In each of its codes, SBCCI asserts a copyright under which it claims the exclusive right to publish these codes or license their reproduction and publication. Despite its copyright, SBCCI ensures free access by specifying that once a governmental unit enacts such a model code into law, copies must be made available for inspection by the public *809 in the enacting government’s offices. As a general proposition, members of the public may make or obtain copies of portions of the adopted versions of SBCCI codes from city offices or local libraries, or may purchase copies of the codes directly from SBCCI and from some third-party sources, such as bookstores.[1]
Several municipalities in North Texas have adopted SBCCI’s codes, including the towns of Anna and Savoy. Veeck avers that he attempted to obtain a copy of the building code of his hometown of Denison, Texas, after learning that it had adopted SBCCI’s Model Building Code as its own. Failing to locate Denison’s building code at local bookstores or libraries, Veeck ordered copies of the codes that SBCCI had produced. He ordered these copies in electronic format directly from SBCCI.[2] According to Veeck, he later visited approximately twenty towns in North Texas, including Anna and Savoy, in an effort to obtain copies of their local building codes, not all of which had been produced by SBCCI. Veeck was not able to buy complete copies at any of the towns that he visited.[3] He apparently never attempted to view or copy the SBCCI codes in any city clerk’s or other municipal offices of the towns that had enacted the codes by reference.
In contravention of the software license agreement and copyright notice included with the electronic version of the model codes he purchased from SBCCI, Veeck failed to identify the codes as the products of SBCCI when he posted them on his website. Instead, he simply (and inaccurately)[4] identified them as the building codes of Anna and Savoy, Texas. As detailed in the majority opinion, the litigation ensuing from this conduct culminated with the grant of summary judgment in favor of SBCCI on its claims for copyright infringement. As Veeck cannot legitimately find a safe haven in any of his affirmative defenses, the district court’s order should have been affirmed.
II. ANALYSIS
A. Standard of Review
This case is on appeal from a grant of a summary judgment that dismissed Veeck’s declaratory judgment action and granted SBCCI’s requested copyright infringement and damages relief. We review the record de novo, applying the same standard as the district court.[5]
*810 B. Merits
1. Overview
Despite the efforts of Veeck (and of those amici who support him and of the en banc majority opinion) to paint this case as a broad one with dire constitutional implications, the question before us is truly quite narrow. In fact, it is the majority opinion that creates drastic constitutional alterations by ruling in Veeck’s favor, thereby improvidently decreeing an absolute and inflexible rule, ill-suited for modern realities. Conversely, had we held for SBCCI, we would have remained well within the precedential and persuasive boundaries of established copyright law. My analysis is necessarily delimited by the particular, undisputed facts of the case: Veeck is a non-commercial, non-educational, non-contractor, non-official, non-resident of either Anna or Savoy, who purchased a copyrighted work, replete with warnings about infringement, and published that work virtually in its entirety on the internet. Veeck published on his website the entire substantive portion of the model building code that he purchased from SBCCI, redacting only the identity of the code’s author (SBCCI) and the statement that the code was copyright protected, and inserting that they were the codes of Anna and Savoy. Veeck’s only professed justification for infringing SBCCI’s copyrights was that two or more small municipalities in northern Texas — of which Veeck was neither a resident nor otherwise related to in any capacity, official or unofficial — had, at the invitation of the code’s author, enacted the codes into law by reference. Because he cannot, Veeck does not contend that Anna or Savoy denied him access to their codes or that he (or anyone else) was unable to view the law to which the citizens of Anna and Savoy are subject. Had Anna, Savoy, or SBCCI blocked the code’s availability, I would be among the first to recognize Veeck’s (and anyone else’s) right of access to “THE law.” That, however, is simply not the case before us; this is not a free access case and cannot be so classified.
Under this narrow set of facts, Veeck prevails only because the en banc majority ruled favorably on at least one of his affirmative defenses,[6] without which, his publication of the codes is indisputably an infringement of SBCCI’s copyright. Given Veeck’s global re-publication of SBCCI’s copyrighted model codes, his at-best remotely tangential relationship to the codes and other laws of Anna and Savoy, his inability to present evidence that he was denied access to the towns’ codes by the towns or SBCCI, the countervailing public policy concerns supporting copyright protection, and the direction and intent of recent congressional enactments and appellate case law, we should not have condoned Veeck’s violation of SBCCI’s copyright.
Reduced to its bare essentials, the majority’s holding in favor of Veeck indisputably enacts the blanket, per se rule that once a copyrighted work is enacted into law by reference, it loses its entire copyright protection, ipso facto, regardless of the nature of the author, the character of the work, or the relationship of the copier to the work or to the governmental subdivision that enacted the work into law through incorporation by reference. Such an extremely broad and inflexible rule propels the majority’s holding far beyond the ambit of Congress’s enactments, the Supreme Court’s pronouncements, and the opinions of other appellate courts that have addressed similar issues. Yet the *811 possibility of obtaining such an all-encompassing ruling constituted Veeck’s only hope of overcoming SBCCI’s copyright protection vis-a-vis an otherwise admitted infringer who is too attenuated from anything that might otherwise excuse the unauthorized copying of these codes cum ordinances, such as a “need to know” for purposes of complying with one or more provisions of the codes. Veeck meets none of these criteria.

2. Due Process/Public Domain

a. Absence of Controlling Legal Authority
In the absence of an expressed pronouncement from either the Supreme Court or Congress,[7] our creation of an automatic rule rendering the copyright of a model code nugatory per se when and if it is enacted into law is unwise, imprudent, and far in excess of our authority. Before such a work is enacted into law, the Copyright Act unquestionably affords copyright protection to its author; and Congress has given no indication that, on enactment, this protected status evanesces ipso facto as to the whole universe of potential copiers.[8] As I discuss in greater detail below, recent congressional enactments and accompanying federal agency policies strongly predict that, were Congress to address the issue here presented, it would preserve the protection of SBCCI’s copyright, at least under circumstances like those we consider today.[9]
As for the Supreme Court, its most analogous opinion, Banks v. Manchester, falls markedly short of answering the question.[10] The Court grounded its eentury- and-one-quarter old Banks holding — that judicial opinions cannot be copyrighted- — in the logic that, as the product of judges who are paid from public coffers and elected or appointed for the sole purpose of interpreting and applying the law, judicial opinions can never be copyrighted.[11] Thus Banks turns not on the nature of the work but on the nature of the author. By its own terms, the Banks holding is obviously limited to the work of taxpayer-paid public officials who produce or interpret the law. *812 The majority’s stretching of Banks to the facts of the instant case constitutes a clear overreaching that finds no definitive support from any controlling authority.
In the absence of expressed congressional guidance or directly controlling Supreme Court precedent, we were left to address — prudentially—a wide-open and unresolved question of copyright law: Should the entirety of a privately confect-ed and promulgated model code, access to which has been denied to none, lose its copyright protection in toto, against all the world, solely by virtue of its enactment into law by reference? If Congress or the Supreme Court wishes to strip totally the copyright protection otherwise enjoyed by model codes as an automatic result of being enacted into law, and to justify such emasculation by invoking the doctrines of free speech, due process, merger, or the like, that would be their prerogative. Prudence demands, however, that so large a step beyond all established legal boundaries should not have been taken first by an intermediate appellate court. Indeed, recent appellate case law, congressional pronouncements, and federal agency actions, predict the diametrically opposite result: a discernable trend towards greater governmental adoption of privately created codes with concomitant retention of copyright protection, tempered, of course, by express or implied consent or waiver — or even fair use — for those officials, residents, contractors, subcontractors, and design professionals who have a need to view and copy portions of codes to comply with their provisions.
b. Policy Analysis for Copyright Protection
What Banks and other opinions undeniably teach about assessing the copyright protection of works like the codes here at issue is that “[t]he question is one of public policy....”[12] Accordingly, these decisions do not stand for the abstract and generic proposition that all law qua law, regardless of its form, authorship, or content, is automatically unprotected fair game as to all copiers, without distinction. Hence, courts are given the weighty task of balancing, on the one hand, the policy concerns that favor the constitutionally mandated retention of copyright protection for privately authored works and, on the other hand, the policy concerns that would permit stripping the author of a privately created work of copyright protection once that work is enacted into law. I do not dismiss lightly the policy considerations supporting this latter concern. Yet, when properly limited to the narrow set of facts before us, the scale of countervailing policy considerations is tipped — slightly yet undeniably — in favor of enforcing SBCCI’s copyright, vis-a-vis Veeck and any others (but only they) who are identically situated.
I begin with an assessment of the policy consideration supporting Veeck’s position — namely, the due process and public domain concerns. As an initial matter, the type of due process asserted by Veeck is murky at best. He was not denied access to the codes by either the towns or SBCCI (indeed, he has never alleged that he even tried to attain access directly from either town, or his home forum for that matter), *813 and he was never charged with or prosecuted for a code violation;[13] therefore, his claim cannot be based on procedural due process. And, inasmuch as copyright is a federal law, no state action could deprive him of a fundamental right that would trigger a substantive due process claim. Neither has Veeck pointed to any state actor who has purportedly denied him due process. Yet despite his unimpeded access to the law and the absence of state action, Veeck argues amorphously that his due process rights somehow allow him freely to copy and publish otherwise copyright-protected codes once they are enacted into law by reference.
I reiterate for emphasis that this would be an entirely different case if Veeck’s (or anyone’s) access to the law had been denied or obstructed; instead, we deal here only with Veeck’s bald pronouncement— now legitimated by the majority opinion' — • that, once a code is enacted into law, due process does not merely afford him access, but also gives him unfettered copying and dissemination rights.[14] The majority’s acceptance of Veeck’s position is truly a novel extension of any prior judicial recognition of a due process right. True enough, Veeck can copy and publish judicial opinions and statutes on his website with impunity. He can do so, however, not because of his due process rights, but rather because — as judicial opinions and legislatively drafted statutes have never enjoyed copyright protection, could never enjoy such protection, and are in the public domain from the moment of their inception— such works are entitled to no copyright protection or restrictions.[15]
Logically then, the only possible support for Veeck’s due process position is his wholly unsupported assertion that, by virtue of their adoption into law by reference, the codes have entered the public domain and are therefore denuded of all copyright protection whatsoever, regardless of their content or the identity of the author or other interested parties. According to Veeck — and now our en banc majority— simply by virtue of their adoption into law, SBCCI’s model codes have become “THE law”; and as THE law, all THE people (not just those who may be deemed metaphysically to have been the authors by virtue of their elected legislatures’ acts of adoption) have an absolutely unfettered right to do whatever they please in the way of copying and publishing, in total disregard of the author’s otherwise valid and enforceable copyright.
Admittedly, the majority’s argument finds rhetorical support from the First Circuit’s dicta in Building Officials & Code Admin, v. Code Technology, Inc. (BOCA), in which that court stated “[t]he citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions because the law derives its authority from the consent of the public, expressed through the democratic *814 process.” [16] Undoubtedly, this metaphorical concept of citizen authorship cum ownership has great symbolic, “feel-good” appeal. The majority’s uncritical application of that proposition to the instant case, however, naively treats all manifestations of “THE law” in our increasingly complex society monolithically and without differentiation. The Supreme Court took no such position in Banks; in fact, Banks addresses only judicial opinions and other pronouncements of the law created ab initio by publicly paid officials.[17] Furthermore, although the symbolic position advanced in BOCA’s grandiloquent dicta ostensibly contemplates a broad application for the proposition of citizen authorship and control, BOCA’s actual holding is very narrow and unrelated to any such abstract musings about the democratic process.
In fact, the BOCA court expressly avoided deciding whether BOCA’s model code retained its copyright after enactment, noting that “the rule denying copyright protection to judicial opinions and statutes grew out of a much different set of circumstances than do these technical regulatory codes....”[18] Therefore, the majority’s rote application of the lofty platitude of citizen ownership of “THE law,” without exploring the distinctions between different types of enactments and the policy considerations attendant on each, is far too simplistic. Such an analysis is inconsistent with the thorough policy evaluations evidenced by those courts that heretofore have deliberated on similar copyright issues.[19]
The privately created model codes enacted into law in this case are easily distinguishable from judicial opinions or statutes in several important respects. First and most obviously, model codes are not created by elected or appointed officials paid from public fisc, rendering inapt the mythical concept of citizen authorship. Indeed, to the exact opposite, rather than producing regulatory codes themselves, the officials elected as the citizens’ voice chose, on ■behalf of their constituents, not to head down the long, expensive, and highly technical road of special code drafting, opting instead to adopt, cost-free, codes authored by private entities, because doing so is convenient, efficient, and cost-effective.
Second, these narrowly focused codes are detailed and complex, requiring technical expertise on the part of the author. Third, they are of limited, highly specialized effect as to who has a real interest and is actually affected, unlike judicial opinions and statutes, which generally have broad if not universal application.
Finally, Congress itself has provided the strongest support for the proposition that these privately created codes should be treated differently than other laws. Recognizing that the production of a comprehensive technical code requires a great deal of research, labor, time, and expertise, Congress in the National Technology and Transfer Act of 1995 (the “NTTA”) expressly directs that “Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies....”[20] *815 The OMB, in its Circular A-119, which was designed to provide guidance to federal agencies in the wake of the NTTA, requires that “[i]f a voluntary standard is used and published in an agency document, your agency must observe and protect the rights of the copyright holder and any other similar obligations.”[21] These pronouncements by Congress and the OMB strongly evince a recognition that the privately created regulatory codes and standards differ greatly from either judicial opinions or a statutes. Technical codes are indispensable resources in today’s increasingly complex, high-tech society, and they deserve authorship protections not afforded to other types of “THE law.”
The First Circuit’s overbroad dicta in BOCA was announced in 1980, well before the advent of the internet and well before the announcement of the federal government’s legislated policy directing the adoption of privately created codes to serve the principles of efficiency and economic competition.[22] Moreover, recent appellate case law supports the recognition of the clear differences between, on the one hand, privately developed standards that are adopted into law by reference and, on the other hand, law created by legislators and judges.[23] Thus, the majority’s superficial *816 ly appealing contention that from a policy perspective, “THE people” may do as they please with “THE law” rests on the flawed foundation that “THE law,” irrespective of whether it be in the form of opinions, statutes, or regulatory standards or codes — and irrespective of by whom it is “made” — should be treated identically. Modern realities and case law directly contradict this simplistic abstraction: The policy considerations that dictate unlimited and unrestricted publishing of judicial opinions and statutes simply do not appertain here.
The policy concerns supporting the retention of at least some copyright protection for SBCCI are more persuasive and probative. First and most importantly, unlike judges and legislators who are paid from public funds to issue opinions and draft laws, SBCCI is a private sector, not-for-profit organization which relies for its existence and continuing services, in significant part, on revenues from the sale of its model codes.[24] The necessity of maintaining the economic incentive of copyright protection for these private entities prompted the Ninth Circuit to rule in favor of the AMA’s retention of its copyright in the Physician’s Current Procedures Terminology (“CPT”) despite a federal agency’s adoption of the CPT:
The copyright system’s goal of promoting the arts and sciences by granting temporary monopolies to copyrighthold-ers was not at stake in Banks because judges’ salaries provided adequate incentive to unite opinions. In contrast, copyrightability of the CPT provides the economic incentive for the AMA to produce and maintain the CPT. “To vitiate copyright, in such circumstances, could, without adequate justification, prove destructive of the copyright interest, in encouraging creativity,” a matter of particular significance in this context because of “the increasing trend toward state and federal adoptions of model codes.”[25]
This approach is also consistent with the Second Circuit’s two pronged test in County of Suffolk for determining whether a work may be deemed to be in the public domain: “(1) whether the entity or individual who created the work needs an economic incentive to create or has a proprietary interest in creating the work and (2) whether the public needs notice of this particular work to have notice of the law.”[26] Here, without the ability to control unrestricted gratuitous dissemination of its model codes, SBCCI would lose significant revenue, in turn substantially impinging on the financial incentive and abili *817 ty to continue creating and revising its model codes, absent some alternative source of funds.[27]
The importance of affording organizations like SBCCI protection from attenuated third parties like Veeck — even when motives are pure and unfair financial competition is not the goal — is best underscored by verbalizing the natural consequence of reducing the revenues, and thus the creative incentives, for organizations like SBCCI. Without private code-creating entities, our smaller towns — and even some of our larger cities, states, and agencies of the federal government— would be forced to author their own regulatory codes. Such a task would inefficiently expend the time and resources of the legislative and executive bodies of these governmental entities, not to mention the question of available expertise. To create codes of appropriate detail, accuracy, and information, governmental bodies would have to enlist the aid of technical experts, undoubtedly at considerable cost. Finally, causing municipalities, states, and the federal agencies to engage in this activity could lead to innumerable variations of any given code, thereby undermining uniformity and, with it, safety and efficiency. For small towns like Anna and Savoy, such a result could be even more detrimental, as their limited resources well might be insufficient to absorb the costs of creating their own codes. Ultimately, taxpayers would end up paying for a service that is currently provided efficiently, expertly, and at no expense to them.
I hasten to add that, for my analysis to have force, SBCCI need not be put completely out of business. Continued maintenance of a revenue source from sales of codes to individual owners, architects, engineers, materials suppliers, builders and contractors as well as libraries and other more attenuated purchasers, all of whom buy copies of the codes directly from SBCCI, serves another public interest. I refer to the continuation of SBCCI’s independence from the self interest of its dues-paying members, who otherwise might be in a position to command more influence were SBCCI forced to obtain too great a share of its revenue from such supporters. Clearly, SBCCI’s receipts from sales of the codes substantially reduces the potential for greater dependence on its membership, presumably allowing SBCCI to operate without becoming entirely beholden for its existence to self-interested entities.
Finally, denying the Veecks of the world unrestricted republication and dissemination rights does not obstruct reasonable and necessary usage of and compliance with the adopted codes. I remain confident that the copyright doctrines of fair use and implied license or waiver are more than adequate to preserve the ability of residents and construction industry participants to copy any portions of the code that they want or need to view. The fair use doctrine would also protect the use of the code, or portions of the code, as a teaching tool and would allow experts, lawyers, and judges freely to cite the code in their briefs or opinions without infringing SBCCI’s copyright. These existing internal safeguards in copyright law show up the majority’s dire predictions for the unrealistic hyperbole that they are.
It is important to keep in mind the record reality that neither Anna and Sa *818 voy themselves, nor builders, contractors, design professionals, or residents of Anna or Savoy, have complained of denied access to the codes or being hampered in their efforts to use, copy, or comply with the codes in a manner consistent with copyright law. Thus, the well-established doctrines of implied license and fair use preserve the public interest by allowing copyright protection to co-exist peacefully with all convenient and necessary use of the model codes.
In sum, Veeck has no real support for his infringement, being relegated to his abstract solipsism that due process immunizes any republication of the SBCCI’s model codes once they are enacted into law by reference. This court’s en banc majority holding today ignores case law from the Supreme Court and other appellate courts, which have instructed us that our conclusion here cannot be based on absolute or generic pronouncements regarding the nature of THE law. Instead we should reach our conclusion only after a careful weighing of the policy considerations of due process and copyright law in the unique framework of the particular facts of each case. Moreover, to the extent that recent congressional enactments and federal agency policies give guidance, they indicate that SBCCI’s copyright protections should be respected despite adoption of its codes into law.
Summarizing all pertinent factors- — -(1) the lack of controlling precedent from the Supreme Court or specific guidance from Congress on the issue, (2) federal law and federal agency policy encouraging the adoption of model codes and increasing the trend toward federal and state adoption of model codes, (3) the palpable distinction between the model codes at issue here and judicial opinions or legislative enactments, (4) case law from our fellow circuits that supports the retention of copyright protection even after adoption by reference into law, (5) the complete absence of any denial of access, (6) the truism that neither due process nor the metaphorical concept of citizen ownership of the law mandates totally unrestricted publication of adopted model codes, (7) SBCCI’s identity as a private not-for-profit company which, unlike courts and legislatures, needs self-generated financial resources to continue independently creating and modifying its codes, (8) the knowledge that governmental obtain, free of cost, accurate, efficient and uniform regulatory codes which otherwise would be time-consuming and expensive (if not impossible in many instances) to develop in SBCCI’s absence, and (9) the comfort that all reasonable and necessary use, copying, and republication by building owners, builders, contractors, design professionals, teachers, lawyers, as well as citizens and officials of the towns themselves, is assured protection by the fair use and implied license doctrines — convinces me that the public policy scale is tipped in favor of enforcing SBCCI’s copyright protection against Veeck, who has never been denied access to the codes of Anna and Savoy and almost certainly never will be (but, if he ever is, he has alternative remediation available).
Finding that, on balance, these policy considerations favor SBC Cl, I would conclude as a matter of law that, despite being adopted into law, SBCCI’s codes are not in the public domain, and that Veeck’s due process rights cannot be stretched far enough to permit his completely unrestricted copying and dissemination of SBCCI’s codes. Veeek’s other statutory and constitutional defenses similarly fail.
3. The Idea/Expression Dichotomy and Merger
Veeck insists (and now a majority of the active judges of this court agree) that the model codes lose their copyright protection by virtue of the idea/expression (or fact/ex *819 pression) dichotomy in copyright law.[28] Veeck’s basic contention is that when a model code is enacted into law by being adopted by reference, it automatically metamorphoses from “expression” to emerge as an “idea” — and that as an idea, it cannot be protected.[29] Relatedly, he contends that the doctrine of “merger” applies to nullify protection for expressions of an idea any time that there are only one or a very limited number of ways to express a given idea.[30] The cornerstone of both arguments is the definition of “idea” in the context of a model code that has been enacted by reference.
a. Defining “Idea”
Veeck’s argument fails because it misapprehends and misapplies the “idea” concept in copyright law. “Idea” in copyright law is a term of art which does not track its everyday, dictionary meaning. What constitutes an “idea” in the lexicon of copyright law cannot be determined by empirically analyzing a given fact situation until the nascent dividing line between the “idea” and its “expression” finally crystallizes; indeed, just the reverse is true. Case law reveals that identification of the “idea” in a work is not the starting point but the result of a judicial exercise that in turn is highly dependent on the precise factual situation being tested.[31] Therefore, designation of the enacted code as an idea vel non is a legal conclusion to be reached by a court, not an initial factual finding to be gleaned intuitively. That determination of idea is not antecedent to a policy determination regarding the “copyrightability” of the code; to the contrary, it is the logical end-product reached after competing concerns are weighed judicially.[32]
*820 Courts frequently must decide how and at what level to draw the juridical line between idea and expression for copyright purposes. Judge Learned Hand, applying the idea/expression dichotomy to determine if one author’s play infringed the work of another playwright, remarked:
Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his “ideas,” to which, apart from their expression, his property never extended. Nobody has ever been able to fix that boundary, and nobody ever can.[33]
Our task in this case should have been to decide whether the “idea” embodied in the code is defined, at one extreme of the continuum, as the entire code itself in its tangible form, or if instead the “idea” is defined at a more removed and abstract level further along that continuum.
My foregoing analysis has already demonstrated that the policy considerations weigh in favor of granting SBCCI protection against Veeck and other copiers and republishers identically situated. Having laboriously arrived at this conclusion, and accepting that a building code can be expressed in myriad ways, I am convinced that the code in its tangible entirety is not the unprotected “idea” in this situation.[34] None question that this is true for codes that have not been enacted globally into law by reference, and nothing of which I am aware can magically change the expression that is the copyrighted code into a copyright idea by the simple act of adoption as a body of law. Today I need not, and therefore do not, attempt to answer the question of exactly where to draw the line and define the idea presented here. It suffices that the idea at issue in the code is substantially more abstract than the physical entirety of the code itself; so as a matter of law, the code as a unitary whole is not an “idea” to be denied copyright protection absolutely, but rather is one among a significant number of possible “expressions.”
b. Merger
Libertarian advocates of freedom from essentially all copyright protection attempt to find a safe harbor in the merger doctrine as a last resort when they do not prevail on the idea/expression dichotomy. The merger doctrine, however, is a limited exception in copyright law, intended to shelter only those rare cases in which the “idea” is susceptible of more than one expression, but the number of. possible expressions is so finite and small as to have effectively “merged” with the idea.[35] Similar to the general misconception of the idea/expression dichotomy, the widely misunderstood merger doctrine also depends on the level of abstraction at which the *821 court defines the “idea” that is alleged to have merged with its expression.[36]
Again, Veeck can find no immunity in the merger doctrine because there exists a plethora of ways to express a building code, thereby making the merger doctrine inapplicable. Although some among the many highly specific, technical, and detailed provisions within a building code might be susceptible of being expressed in only one or a handful of ways — and thus conceivably be subject to merger — a total, unitary building code, in globo, may be written, organized, and presented in any one of innumerable forms. All concede that many code-drafting organizations like SBCCI exist and that they are constantly creating competing versions of topical codes; yet each is expressed differently— and each is copyrighted. As there exist considerably more than a tiny, finite number of ways to express a building code, the merger doctrine is inapplicable and thus unavailable to insulate Veeck’s infringement from copyright protection.
4. Other Affirmative Defenses to Copyright Infringement
Veeck also contends that even if the codes are not in the public domain and cannot be classified as “ideas,” his code copying and dissemination activities are protected by the doctrines of free speech, misuse, waiver, and fair use under copyright law.[37] I address each of these contentions in turn.
a. Free Speech
None contends that SBCCI made any attempt to use its copyright to block or interfere with the public’s access to the municipal codes of Anna and Savoy, Texas. In Schnapper v. Foley, the District of Columbia Circuit held that the First Amendment does not require the voiding of a copyright, even in a government-commissioned work, absent evidence that access to the work had been denied.[38]
Dealing only with the record facts, I find that Veeck’s Free Speech defense is further weakened by what he did not do: He did not first obtain copies of the codes of these two cities and then publish them on the Internet. Instead, he purchased directly from SBCCI a copy of all its 1994 Standard Codes, which arrived bearing a copyright notice and a license agreement. Ignoring these, Veeck copied that set onto his computer and posted it' on his own website, identifying it as containing the municipal codes of the two towns but without advising the identity of the author or the fact of copyright. That which Veeck did and that which he did not do are inherently different: What he did not do comes closer to an interested party’s fair use of his local building code;[39] what he did exemplifies a purchaser who assumes the risk of actively disregarding the intellectual property rights held and announced by the author/supplier of a commercial product.
Factually, in enforcing its copyright in its model codes, SBCCI simply is not stifling access to, or speech about, THE law. SBCCI has not violated the First Amendment vis-á-vis Veeck.
*822 b. Misuse
The equity-based defense of copyright misuse, which prevents a culpable author from prevailing in an action for the infringement of a misused copyright, “ ‘forbids the [copyright holder’s] use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant.’ ”[40] In Practice Management, the Ninth Circuit concluded that the American Medical Association misused its copyright when it licensed its coding system to the Health Care Financing Administration. The copyright misuse was the AMA’s imposition of a condition on its grant of a license that the licensee-agency agree not to use any competing system.[41] Veeck, in contrast, has raised no genuine issue of material fact regarding any purported misuse by SBCCI of its copyright. The summary judgment record is devoid of evidence that the organization mandates the exclusive use of its codes or any other of its services as a condition of a governmental subdivision’s adopting one of the codes. There is thus no record evidence of facts constituting misuse that in turn would prevent enforcement of SBCCI’s copyright.
c. Waiver
Neither can Veeck prevail on his assertion that SBCCI expressly or impliedly waives its entitlement to copyright protection vis-á-vis the whole world when it successfully encourages municipalities to adopt its codes by reference. I readily concede that a copyright can be waived by the author’s inaction.[42] Here, however, SBCCI expressly reserved its copyright in the codes. The district court found undisputed the fact that the materials Veeck received from SBCCI “contained the copyright expressions of the Defendant.” Having concluded that SBCCI’s codes are not in the public domain and that due process does not require suppression of SB CCI’s copyright, I am convinced that the organization has done nothing to waive copyright protection expressly.
Copyright also may be waived implicitly by virtue of a particular act, even if waiver was neither explicit nor the intended result.[43] Veeck’s argument in this regard is that by encouraging the towns to adopt the codes, SBCCI impliedly waived its copyright protection. This presupposes that waiver must be an “all or nothing” proposition, and thus cannot be implicit as to some parties, such as the adopting municipalities, without loosing its effectiveness altogether, even unto strangers like Veeck. Except for his bald assertion, however, Veeck presents no viable support for his waiver proposition. Moreover, when properly analyzed, his argument is nothing more than a thinly disguised reformulation of his due process/publie domain argument — namely, that the mere fact of adoption automatically and totally vitiated SBCCI’s copyright and superceded SBCCI’s contractual protection as against all comers.
As fully explicated above, my analysis reaches the conclusion that, as a matter of law, SBCCI’s codes are not in the public *823 domain and that they retain their copyright protection against Veeck and others thus situated. I observe that the district court also concluded that the fact that SBCCI had given the North Carolina Building Inspectors Association permission to publish on the Internet that state’s building codes, which are modeled on the SBCCI codes, does not constitute universal waiver. As the district court noted, “[cjountless entities provide free access to materials on the Internet and still retain enforcement of their copyrights.”
d. Fair Use
Finally, Veeck argues that his posting of SBCCI’s copyrighted material on the Internet constituted a “fair use.” Congress has excepted from infringement of copyrighted materials such specified uses as news reporting, teaching, and research.[44] Courts are instructed to consider four factors when deciding whether a particular use of copyrighted material is a “fair use”:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.[45]
When, as with Veeck’s infringing activity here, the use of a copyrighted work is noncommercial, the ability to defeat an infringer’s affirmative defense of fair use requires “proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.”[46]
The key question under the “purpose and character” prong is whether the alleged infringer’s product “merely supersedes the objects of the original creation or instead adds something new with a further purpose or different character, altering the first with new expression, meaning, or message. In other words, it asks whether and to what extent the new work is ‘transformative.’ ”[47] Veeck’s posting of the codes on his website was not of a commercial nature or for nonprofit educational purposes. Neither did his actions in this case have any transformative effect on the original work.[48] In fact, there is neither an apparent nor announced purpose behind Veeck’s wholesale copying except that he chose to do so and believes, empirically, that he has the unfettered right to do so. He presents no affidavits or other summary judgment evidence to suggest that the townsfolk of Anna and Savoy or contractors, builders, or other interested parties, would not have access to the codes without Veeck’s intervention.
*824 The nature of the copyrighted work constitutes the second prong of the fair use analysis. The work at issue is an original technical code produced -by a non-profit organization to encourage uniformity, safety, and economy in a technical area for the benefit of an increasingly complex society. Within the four-pronged jurisprudential test for fair use, Veeck’s position finds its only viable support in this one factor. Although the code is an original work requiring creativity on the part of SBCCI, it is also an informational and functional work. This fact broadens the scope of the fair use defense.[49] In addition, the copyrighted work in this case is part of the regulatory codes of Anna and Savoy. Although this factor lends a modicum of support to Veeck’s position, it (1) must be considered in light of all the other factors, and (2) is not as significant as the others in the fair use determination.[50]
The third fair use factor — amount and substantiality of portion used vis-a-vis copyrighted work as a whole — weighs heavily against Veeck. He published verbatim the entire set of codes obtained from SBCCI. Even though total copying does not automatically defeat a fair use defense, and partial copying does not automatically validate it, the general rule is that reproduction of an entire work constitutes an wni&ir use.[51] Moreover, the codes copied here were not, literally speaking, “the” codes of Anna and Savoy: Even though the towns’ ordinances adopted the model codes that Veeck copied, the enacting ordinances also contained modifications and clarifications not found in the verbatim versions of the SBCCI codes posted by Veeck.
Fourth, Veeck’s use could have a substantially detrimental effect on the market for the copyrighted work. In considering this factor, we must assess the consequences of wide-spread conduct similar to Veeck’s, not just his alone.[52] There is no genuine dispute, based on the summary judgment record, “that some meaningful likelihood of future harm exists.”[53] Veeck’s posting of the codes on the Internet could prove harmful by depressing the price and reducing SBCCI’s market, thus depriving it of income used in its socially valuable efforts of confecting, promulgating, and revising model codes. Veeck’s non-commercial, free publication of the codes exacerbates the detrimental effect on the potential market: By furnishing the codes entirely free of charge, he could effectively destroy the market rather than simply creating competition and price suppression. When viewed in this light, the free promulgation of a work is seen to be potentially more financially deleterious than is commercial piracy or cut-rate competitive availability. Currently, the sale of the copyrighted codes to builders, contractors, design professionals, and other interested parties (1) accounts for one-third of *825 SBCCI’s income, (2) provides incentive for SBCCI to stay in business so that small governmental subdivisions, like the ones at issue in this case, can obtain the benefits of a pre-crafted technical code, (3) fosters uniformity, and (4) provides some measure of independence to SBCCI from its members by holding down the extent of SB CCI’s reliance on membership dues and assessments.
The situation presented in this ease is not one of mere copying of the codes for personal use, or of Veeck’s asking SBCCI for permission to post the codes on the web and having permission denied. As Veeck copied SBCCI’s model code verbatim, the fair-use calculus weighs heavily against him. Veeck’s total copying and promulgation of SBCCI’s model code, and the potentially harmful effect of such copying on the market, render his use unfair.
C. SBCCI’s Infringement Counterclaim
SBCCI holds valid copyrights in its codes, and Veeck has expressly admitted copying them. In the absence of a viable defense, the district court was correct in holding that SBCCI established copyright infringement. Under these circumstances, I am satisfied that the district court’s conclusions and its award of an injunction and the minimum statutory damages on each of the five counts of copyright infringement are free of error.[54] Likewise, I find no abuse of discretion in the district court’s award of attorneys’ fees.[55]
III. CONCLUSION
Two decades ago, in BOCA,[56] the First Circuit wrestled with the serious issues raised by what was then only a “possible trend” toward local, state, and federal adoption of model codes.[57] That court wisely left open for future evaluation the modern realities surrounding technical regulatory codes and standards. As the BOCA court wrote, groups that develop such works “serve an important public function; arguably they do a better job than could the state alone in seeing that complex yet essential regulations are drafted, kept up to date and made available.” [58] In like manner, the two federal circuits that subsequently addressed challenges similar to that considered by the First Circuit in BOCA have declined to invalidate copyrights in works incorporated by reference into the law.[59] In the legislative arena, Congress has decreed the policy that federal agencies adopt privately authored technical standards without voiding the protection afforded to the authors by copyright; and the OMB has directed all federal agencies adopting such standards to respect the copyright protections of the copyright holders — the diametric opposite of causing copyright protection to vanish when the work is adopted as law.
*826 I emphasize that my analysis is restricted to the narrow set of facts and circumstances before us. At bottom, I think it improvident for this court to legislate judicially an absolute, per se rule that referential enactment of a copyrighted work like a technical code into law mystically metamorphoses it into an “idea,” puts it into the public domain, waives its copyright protection universally, and otherwise strips it of copyright protection vel non. Under the instant circumstances, no one is being denied reasonable access to the SBCCI codes that have been adopted in globo by local governments; neither does Veeck’s specific actions, however altruistic they might have been, make a viable case for fair use. Nevertheless, I readily concede, that even slightly different facts under but slightly different circumstances could convince me to support a different result, albeit not a per se rule.
Today, the trend toward adoption of privately promulgated codes is widespread and growing, and the social benefit from this trend cannot be seriously questioned. The necessary balancing of the countervailing policy concerns presented by this case should have led us to hold that, on these facts, the copyright protection of SBCCI’s privately authored model codes did not simply evanesce ipso facto, when the codes were adopted by local governments; rather, they remain enforceable, even as to non-commercial copying, as long as the citizenry has reasonable access to such publications cum law — and subject, of course, to exceptions for implied or express waiver or consent, fair use, or other recognized exceptions, when applicable. For these reasons, I cannot join in the majority’s inflexible reasoning and unnecessarily overbroad holding. I therefore respectfully dissent.

. As noted by the majority members and nonmembers are charged different prices for copies of the codes. For example, members were charged $48 for a copy of SBCCI's 1994 Standard Building Code, for which nonmembers were charged $72.

. The record is not completely clear, but it appears that Veeck made no attempt to view or copy the codes in the Denison city clerk's office. When Veeck received the 1994 codes from SBCCI, he realized that Denison had adopted the 1988 version of the building codes. He posted the 1994 codes on his Internet site despite the fact that they were not the same as the version adopted by Deni-son.

. It appears that in some of the cities, the correct version of the building code was not available at alternative locations. For instance, Sherman, Texas, had adopted the 1997 version of the building code, but the local library had only the 1994 version on hand.

. Veeck did not include the enacting ordinances of either municipality. Anna's enacting statute, for example, includes ordinances resolving conflicts between the adopted SBCCI code and previous city laws and also includes a clarification- regarding which city officials would be responsible for enforcing different sections of the code.

. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir.1998).

. Veeck advanced defenses grounded in due process, public domain, fair use, waiver, copyright misuse, merger, and free speech.

.Cf. CCC Information Services, Inc. v. Maclean Hunter Market Reports (CCC), 44 F.3d at 73-74 (2d Cir.1994) (discussing whether the Red Book, which was adopted by States as the legal standard for car valuations, passed into the public domain by virtue of its reference into the law):
The [public domain] argument is that the public must have free access to the content of the laws that govern it; if a copyrighted work is incorporated into the laws, the public need for access to the content of the laws requires the elimination of the copyright protection.
No authority cited by CCC directly supports the district court’s view [the view that the Red Book had passed into the public domain].
We are not prepared to hold that a state’s reference to a copyrighted work as a legal standard for valuation results in loss of the copyright, (emphasis added).

. Cf. County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179, 193 (2d Cir.2001) ("The determination that no one may own a copyright in statutes and opinions arises not from a specific provision of the Copyright Act, but from a ‘judicial gloss' on the Act.”) (citation omitted).

. See, e.g., National Technology and Transfer Act of 1995, P.L. 104-113, § 12(d), 110 Stat. 783 (1996); OMB Circular A-119, 63 Fed. Reg. 8545, 8555 (Feb. 19, 1998).

. Banks v. Manchester, 128 U.S. 244, 253, 9 S.Ct. 36, 32 L.Ed. 425 (1888) (holding judicial opinions uncopyrightable because they are created by judges paid from the public's coffers); see also Wheaton v. Peters, 33 U.S. 591, 668, 8 Pet. 591, 8 L.Ed. 1055 (1834) (same).

. This rationale is also applicable to statutes created by legislators paid by public funds.

. Banks, 128 U.S. at 253, 9 S.Ct. 36; see also CCC, 44 F.3d at 68:
We reach this conclusion [reversing summary judgment in favor of a publisher who copied portions of appellant's used car valuations which were referenced by state statutes] based on the need to balance the conflicts and contradictions that pervade the law of copyright, and the need, where elements of copyright law conflict, to determine, as a policy judgment, which of its commands prevails over the other, (emphasis added).

. Should some municipality, or SBCCI, ever truly restrict the public’s free access to the enacted codes, any defendant prosecuted for violating sections of the building codes would surely prevail on a due process defense.

. Cf. Practice Management Information Corp. v. American Medical Association (Practice Management), 121 F.3d 516, 519 (9th Cir.1997) (in denying the Practice Management's due process/public domain argument, the court noted “Practice Management is not a potential user denied access to the CPT, but a putative copier wishing to share in AMA’s statutory monopoly. Practice Management does not assert the AMA has restricted access to users or intends to do so in the future.”).

.Moreover, as further discussed infra, wide, unrestricted dissemination of opinions and statutes has no possible harmful effects on the "creativity” of those who author judicial opinions and statutes; their jobs and their compensation have no nexus to their creativity, and vice versa.

. BOCA, 628 F.2d 730, 734 (1st Cir.1980).

. County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179, 194 (2d Cir.2001) ("Banks is properly read as requiring a determination whether the particular governmental entity or employee has adequate incentive to create the work absent copyright protections.”).

. BOCA, 628 F.2d at 736 (emphasis added).

. See Banks, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425; County of Suffolk, 261 F.3d 179 (2d Cir.2001); Practice Management, 121 F.3d 516 (9th Cir.1997); CCC, 44 F.3d 61 (2d Cir.1994); BOCA, 628 F.2d 730 (1st Cir.1980).

. National Technology and Transfer Act of 1995, P.L. 104-113, § 12(d), 110 Stat. 783 (1996). I note that although the NTTA and the OMB Circular address the policy of using privately created standards and retaining *815 copyright protection for those standards, they are still wholly applicable to the analysis of privately created codes. Rather than a substantive, meaningful legal distinction, Congress’s and the OMB’s references to "standards” rather than “codes,” in all likelihood reflects the difference between federal and local lawmaking. Federal law, because it does not govern the safety and building ordinances of states or municipalities, generally addresses national standards instead of specific safety and building requirements embodied in a code. In substance, though, technical codes are "standards;” for purposes of today’s decision, those terms are synonymous. The majority's purported distinction between standards and codes is far too narrow to decide the instant case on those grounds — it is a paradigmatic example of a distinction without a difference. The same principles that apply to the analysis of privately created standards apply to privately created codes — both deal with the protection afforded to privately organized and authored collections of hyper-technical data for use in a specialized segment of today’s complex society that benefits from uniformity in those data. This understanding is supported both by appellate case law and evidenced by the standards-creating bodies filing amicus briefs in support of SBCCI’s position. See Practice Management, 121 F.3d at 518-19 ("As the AMA points out, invalidating its copyright on the ground that the CPT entered the public domain when HCFA required its use would expose copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation.”) (emphasis added); see also amicus filed by, inter alia, American National Standards Institute in support of SBCCI.

. OMB Circular A-119, 63 Fed.Reg. 8545, 8555 (Feb. 19, 1998)(emphasis added).

. Id. at 8554:
The use of such standards, whenever practicable and appropriate is intended to achieve the following goals:
a. Eliminate the cost to the Government of developing its own standards and decrease the cost of goods procured and the burden of complying with agency regulation.
b. Provide incentives and opportunities to establish standards that serve national needs.
c. Encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization [uniformity] of standards.
d. Further the policy of reliance upon the private sector to supply Government needs for goods and services, (emphasis added)

. See County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179 (2d Cir.2001) (developing a two-pronged economic incentive/public need test to determine whether tax maps developed by the County of Suffolk were in the public domain from inception and therefore stripped of copyright protection; citing Practice Management and the panel opinion in Veeck, deciding that, as a matter *816 of law, the county's tax maps were not in the public domain); Practice Management, 121 F.3d 516, cert. denied, 522 U.S. 933, 118 S.Ct. 339, 139 L.Ed.2d 263, opinion amended by 133 F.3d 1140 (finding that the American Medical Association did not lose the right to enforce its copyright when use of its promulgated coding system was required by government regulations); CCC, 44 F.3d. 61, cert. denied, 516 U.S. 817, 116 S.Ct. 72, 133 L.Ed.2d 32 (upholding copyright of privately prepared listing of automobile values that states required insurance companies to use); see also 1 Melville B. Nimmer & David Nimmer, Nim-mer on Copyright § 5.06[C], at 5-91 (2000) ("It is questionable whether [the due process clause] justifies the denial of copyright to a private person or group who produces such a model code.”).

. Approximately one-third, or $3 million, of SBCCI’s annual $9 million dollar revenue is generated by sales of model codes to contractors and other interested parties. The remaining revenue is mainly derived from the annual fees of voluntary members and member organizations. Voluntary members include scholars, builders, contractors, and governmental entities that have adopted the code.

. Practice Management, 121 F.3d at 518 (quoting 1 Nimmer on Copyright § 5.06[C], at 5-92 (1996))(emphasis added).

. County of Suffolk, 261 F.3d at 194.

. We note here that the second prong of the County of Suffolk test is no barrier. As stated above, although the codes are necessary for a citizen to have proper notice of the building code regulations of Anna and Savoy, no allegations have been made here to suggest that Veeck was denied notice or access to the codes. We stress that the right of unlimited republication is a far cry from the rights of access to and notice of the law.

. 17 U.S.C. § 102(b):
In no case does copyright protection for an original work of authorship extend to an idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.
See also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (“[C]opyright law assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship.”)

. Mason v. Montgomery Data, Inc. 967 F.2d 135, 138 (5th Cir.1992) ("Thus, while a copyright bars others from copying an author’s original expression of an idea, it does not bar them from using the idea itself.”) (emphasis in original)

. Id. at 138:
In some cases, however, it is so difficult to distinguish between an idea and its expression that the two are said to merge. Thus, when there is essentially only one way to express an idea, "copying the ‘expression’ will not be barred, since protecting the 'expression’ in such circumstances would confer a monopoly of the ‘idea’ upon the copyright owner free of the conditions and limitations imposed by the patent law.” (citations omitted).

. Id. ("A court's decision whether to apply the merger doctrine often depends on how it defines the author's idea. For this reason, in defining the idea the courts should be guided by ‘the balance between competition and protection reflected in the patent and copyright laws.’ ”) (citations omitted); Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960) (L.Hand, J.)(discussing what the court termed as "verbal works,” the court stated "[T]here can be no copyright in the 'ideas' disclosed but only in their ‘expression.’ Obviously, no principle can be stated as to when an imitator has gone beyond copying the ‘idea,’ and has borrowed its ‘expression.’ Decisions must therefore inevitably be ad hoc.”); see also Nimmer on Copyright § 13.03[B][2][a] at 13-60 ("Merely stating the rule [17 U.S.C. § 102(b)], however, does not make any easier the task of drawing the line between where the idea ends and expression begins.”).

. Cf. Nimmer on Copyright § 1.10[B][2] at 1-78 ("On the whole, therefore, it appears *820 that the idea-expression line represents an acceptable balance as between copyright and free speech interests”) (citing United Video, Inc. v. F.C.C., 890 F.2d 1173, 1191 (D.C.Cir.1989)).

.Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.1930). Commentators and courts have labeled this as Judge Hand's “abstractions test.”

. In doing so, I acknowledge that specific portions and discrete facts within the code could be considered facts or ideas, and therefore unprotectable.

. See generally CCC, 44 F.3d at 68; Nimmer on Copyright § 13.03[B][3] at 13-68—13-73.

. See supra note 37.

. Another defense, implied license, was raised by amicus curiae Association of American Physicians & Surgeons, Inc., but was not addressed by either party in the district court or on appeal. Hence, I do not address it. See Christopher M. v. Corpus Christi Indep. Sch. Dist., 933 F.2d 1285, 1292 (5th Cir.1991).

. 667 F.2d 102, 115-16 (D.C.Cir.1981).

. Veeck’s fair use defense is discussed further infra.

. DSC Communications Corp. v. DGI Techs., Inc., 81 F.3d 597, 601 (5th Cir.1996) (quoting Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 977 (4th Cir.1990)).

. Practice Management, 121 F.3d at 520.

. See, e.g., Sherrod v. American Airlines, 132 F.3d 1112, 1119 n. 5 (5th Cir.1998).

.See, e.g., Norma Ribbon & Trimming, Inc. v. Little, 51 F.3d 45, 48 (5th Cir.1995) ("Therefore, even if it be assumed that the ribbon flowers were copyrightable, the Littles through inadequate notice have made them part of the public domain, and Norma Ribbon was free to copy them.”).

. See 17 U.S.C. § 107 (2000).

. Id., see also Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

. Sony Corp. v. Universal City Studios, 464 U.S. 417, 451, 104 S.Ct 774, 78 L.Ed.2d 574 (1984).

. Campbell v. Acuff-Rose Music Inc., 510 U.S. at 579 (citations omitted) (internal quotations omitted).

.In Campbell v. Acuff-Rose Music, while evaluating a fair use defense, the Supreme Court discussed the degree to which a parodist's work transforms a copyrighted original. See 510 U.S. at 579, 114 S.Ct. 1164. There, the parodist was the one making the transformation. In contrast, Veeck admits that he did nothing more than copy SBCCI's model codes verbatim; he did not transform them, through parody or otherwise. Therefore, Veeck's argument that the adoption by reference of SBCCI’s codes by Anna and Savoy were "transformative” events does not find a home in Campbell.

. 4 Nimmer on Copyright § 13.05[A][2][a] (citing Diamond v. Am-Law Corp., 745 F.2d 142 (2d Cir.1984)).

. Id. (citing Campbell v. Acuff-Rose Music Inc., 510 U.S. at 586, 114 S.Ct. 1164; Robinson v. Random House, Inc., 877 F.Supp. 830, 841 (S.D.N.Y.1995)).

. Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 109 (2d Cir.1998).

. Campbell v. Acuff-Rose Music Inc., 510 U.S. at 590, 114 S.Ct. 1164 (consideration of the fourth factor "requires the court to consider not only the extent of the market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and wide-spread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market’ for the original.”) (quoting 4 Nimmer on Copyright § 13.05[A][4]).

.Sony Corp., 464 U.S. at 451, 104 S.Ct. 774 (emphasis added).

. At the pertinent time, 17 U.S.C.A. § 504(c)(1) set the range of statutory damages for each act of copyright infringement at no less than $500 or more than $20,000. A 1999 amendment has raised those amounts to $750 and $30,000, respectively. Id.; Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub.L. No. 106-160, § 2(1), 113 Stat. 1774 (1999).

. Hogan Systems, Inc. v. Cybresource Int'l, Inc., 158 F.3d 319, 325 (5th Cir.1998) (applying abuse of discretion standard of review to award of attorneys’ fees in copyright case). Veeck did not brief the questions of the district court's grant of a permanent injunction or award of damages and attorneys’ fees, and therefore waived them.

. 628 F.3d 730.

. Id. at 736.

. Id.

. See Practice Management, 121 F.3d 516; CCC, 44 F.3d 61.